**Slip Op. 16-57**

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| THE COALITION FOR FAIR TRADE OF HARDWOOD PLYWOOD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES INTERNATIONAL TRADE COMMISSION, | : | Before: Richard K. Eaton, Judge |
| | : | |
| Defendant, | : | Court No. 14-00013 |
| | : | |
| AMERICAN ALLIANCE FOR HARDWOOD PLYWOOD, et al., | : | **PUBLIC VERSION** |
| | : | |
| Defendant-Intervenors, | : | |
| | : | |
| and | : | |
| | : | |
| CHINA NATIONAL FOREST PRODUCTS INDUSTRY ASSOCIATION AND MEMBERS, | : | |
| | : | |
| Defendant-Intervenors. | : | |

OPINION

[The United States International Trade Commission's final negative material injury determination is remanded.]

Dated: June 8, 2016

*Jeffrey S. Levin*, Levin Trade Law, P.C., of Bethesda, MD, argued for plaintiff.

*Charles A. St. Charles*, Attorney-Advisor, Office of General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant. With him on the brief were *Rhonda M. Hughes*, Attorney-Advisor, *Dominic L. Bianchi*, General Counsel, and *Robin L. Turner*, Acting Assistant General Counsel for Litigation.

*Jeffrey S. Grimson*, Mowry & Grimson, PLLC, of Washington, DC, argued for defendant-intervenors American Alliance for Hardwood Plywood et al.  With him on the brief were *Kristin H. Mowry*, *Jill A. Cramer*, *Sarah M. Wyss*, and *Daniel R. Wilson*.

*Jeffrey S. Neeley*, Husch Blackwell LLP, of Washington, DC, argued for defendant-intervenors China National Forest Products Industry Association and its members.  With him on the brief was *Michael S. Holton*.

EATON, Judge: Before the court is the motion for judgment on the agency record, pursuant to USCIT Rule 56.2, of the Coalition for Fair Trade of Hardwood Plywood ("plaintiff" or the "Coalition"), an association of domestic hardwood plywood manufacturers. *See* Pl.'s Rule 56.2 Mem. in Supp. for J. Upon the Agency R. (ECF Dkt. No. 42-1) ("Pl.'s Br."). By its motion, plaintiff contests the final negative material injury and threat of material injury determinations of the United States International Trade Commission ("ITC" or the "Commission") in its antidumping and countervailing duty investigations of hardwood plywood from the People's Republic of China ("China").  *See Hardwood Plywood From China*, 78 Fed. Reg. 76,857 (Int'l Trade Comm'n Dec. 19, 2013) (determinations) ("Final Determinations").

The Commission opposes plaintiff's motion, asking the court to sustain its determinations.  Def. ITC's Opp'n to Pl.'s Mot. for J. on the Agency R. (ECF Dkt. No. 49) ("Def.'s Br.").  Defendant-intervenors, the China National Forest Products Industry Association

and its individual members[1] (the "Chinese defendant-intervenors"), all of which are Chinese

producers and exporters of hardwood plywood, and the American Alliance for Hardwood

Plywood and other American hardwood plywood importers[2] (the "American defendant-

intervenors") join the Government in opposing plaintiff's motion.  *See* Chinese Def.-Ints.' Resp.

in Opp'n to the Coalition's Mot. for J. on the Agency R. (ECF Dkt. No. 55) ("Chinese Def.-Ints.'

Br."); Def.-Ints. Am. Alliance for Hardwood Plywood's Resp. in Opp'n to Pl.'s Rule 56.2 Mot.

for J. on the Agency R (ECF Dkt. No. 53) ("Am. Def.-Ints.' Br.").  For the reasons discussed

herein, the Final Determinations are remanded.


## BACKGROUND

The antidumping and countervailing duty investigations at issue involved hardwood

plywood from China ("subject imports").  "Hardwood plywood is a wood panel product made by

---

[1]     The association members include Shanghai Futuwood Trading Co., Ltd.,
Lianyungang Yuantai International Trade Co., Ltd., Cosco Star International Co., Ltd., Suzhou
Oriental Dragon Import and Export Co., Ltd., Linyi City Dongfang Jinxin Economic & Trade
Co., Ltd., Linyi Evergreen Wood Co., Ltd., Highland Industries Inc. (Hanlin Timber Products
Co., Ltd.), Linyi Huasheng Yongbin Wood Corporation, Xuzhou Longyuan Wood Industry Co.,
Ltd., Qufu Shengfu Wood Work Co., Ltd., Xuzhou Zhongyuan Wood Co., Ltd. (Xuzhou Hansun
Import & Export Co., Ltd.), Shandong Anxin Timber Co., Ltd., Zhejiang Dehua TB Import &
Export Co., Ltd., Qingdao Top P&Q International Corp., Shanghai MaiLin International Trade
Co., Ltd., Xuzhou Shenghe Wood Co., Ltd., Linyi San Fortune Wood Co. Ltd., Pingyi Jinniu
Wood Co. Ltd., Langfang Baomujie Wood Co. Ltd., Yinhe Machinery Chemical Limited of
Shandong Province, and Xuzhou Pinlin International Trade Co. Ltd.

[2]     The American defendant-intervenors are American Alliance for Hardwood
Plywood, American Pacific Plywood Inc., Canusa Wood Products Limited, Concannon Corp.,
Inc. (doing business as Concannon Lumber Co.), Far East American, Inc., Hardwoods Specialty
Products USLP, Holland Southwest International Inc., Kitchen Cabinet Manufacturers
Association, Liberty Woods International, Inc., McCorry & Co. Ltd, Northwest Hardwoods, Inc.,
Patriot Timber Products, Inc., USPLY LLC, Red Tide International (doing business as Wood
Brokerage International), and Benchmark International, LLC.

gluing two or more layers of wood veneer[3] to a core that may itself be composed of veneers or

other types of wood material such as medium density fiberboard[,] . . . particleboard, lumber, or

oriented strand board." Views of the Commission (Final) at 8, CD 343 at bar code 522998 (Int'l

Trade Comm'n Nov. 25, 2013) (ECF Dkt. No. 28-1) ("Views"). It is manufactured in a variety

of thicknesses and is typically used in "furniture, kitchen cabinets, architectural woodwork, wall

paneling, manufactured homes, and recreational vehicles." *Id.* at 9. "Hardwood plywood

products are differentiated by species, quality of veneer, thickness, number of plies, type of core

(veneer, particleboard, [medium density fiberboard], or other), and the type of adhesive used in

the manufacturing process." *Id.*

On September 27, 2012, members of the Coalition filed an antidumping and

countervailing duty petition with the United States Department of Commerce ("Commerce") and

the ITC. Petition for the Imposition of Antidumping and Countervailing Duties, Inv. Nos. 701-

TA-490 and 731-TA-1204 (Final) CD 1 at bar code 491972 (Sept. 27, 2012) ("the Petition").

Thereafter, Commerce and the ITC initiated antidumping and countervailing duty investigations

of imports of hardwood plywood from China. *See Hardwood and Decorative Plywood From

China*, 77 Fed. Reg. 65,172 (Dep't of Commerce Oct. 25, 2012) (initiation of antidumping duty

investigation); *Hardwood and Decorative Plywood From China*, 77 Fed. Reg. 64,955 (Dep't of

Commerce Oct. 24, 2012) (initiation of countervailing duty investigation). Commerce sought to

determine whether hardwood and decorative plywood from China was being sold at less than fair

value, and whether the industry was receiving countervailable subsidies.

---

3           "A 'veneer' is a thin slice of wood which is rotary cut, sliced or sawed from a
log, bolt or flitch." Views of the Commission (Final) at 6, CD 343 at bar code 522998 (Int'l
Trade Comm'n Nov. 25, 2013) (ECF Dkt. No. 28-1) ("Views"). Although the term "veneer" is
used in portions of this opinion in reference to the face veneer of plywood, a veneer can also
comprise the core material of plywood. Views at 6, 8.

On September 23, 2013, Commerce found that subject merchandise was indeed being

sold at less than fair value, and determined final dumping margins ranging from 55.76 percent to

121.65 percent.  *Hardwood and Decorative Plywood From China*, 78 Fed. Reg. 58,273, 58,276–

82 (Dep't of Commerce Sept. 23, 2013) (final determination of sales at less than fair value).

Commerce also made an affirmative countervailing duty determination, finding all but three

mandatory respondents were receiving subsidies, and determining countervailing duty rates

ranging from 13.58 percent to 27.16 percent.  *Hardwood and Decorative Plywood from China*,

78 Fed. Reg. 58,283, 58,283–84 (Dep't of Commerce Sept. 23, 2013) (final affirmative

countervailing duty determination).

The ITC simultaneously conducted an investigation to determine whether a domestic

industry was materially injured or threatened with material injury by reason of imports of subject

merchandise.  The Commission's period of investigation ("POI") was January 1, 2010 through

June 30, 2013, extending back two years prior to the Coalition's filing of the Petition.  Views at

4.  During the Commission's investigation, domestic industry data was collected from the

questionnaire responses of eight domestic producers that produced nearly all of the U.S.

hardwood plywood in 2012.  *See* Views at 4; Final Staff Report, Inv. Nos. 701-TA-490 and 731-

TA-1204 (Final) at III-2, CD 337 at bar code 520495 (Oct. 25, 2013) (ECF Dkt. No. 28-2)

("Final Staff Report").  U.S. import information was based on Commerce's import statistics and

the questionnaire responses of forty-two U.S. importers of hardwood plywood from China,

representing 66.3 percent of total imports from China.  Views at 4; Final Staff Report at IV-1.

The Views of the Commission were also based on questionnaire responses from eighty-nine

foreign producers that collectively produced approximately 52.4 percent of hardwood plywood

imported into the United States from China in 2012.  Views at 4; Final Staff Report at VII-3.

On November 13, 2012, the ITC issued a unanimous preliminary affirmative material

injury determination.  *See Hardwood Plywood From China*, 77 Fed. Reg. 71,017, 71,017 (Int'l

Trade Comm'n Nov. 28, 2012) (preliminary determination) ("On the basis of the record

developed in the subject investigations, the [Commission] determines . . . there is a reasonable

indication that a [United States] industry is materially injured by reason of imports of hardwood

plywood from China that are allegedly subsidized and sold in the United States at less than fair

value . . . .").  Prior to making its final material injury determination, the ITC held a public

hearing on September 19, 2013, and the interested parties submitted pre- and post-hearing briefs.

Final Phase Hearing Transcript, Inv. Nos. 701-TA-490 and 731-TA-1204 (Final) PD 173 at bar

code 518726 (Sept. 20, 2013) (ECF Dkt. Nos. 58-2, 58-3) ("Final Phase Hearing Tr."); Pl.'s Pre-

Hearing Br., Inv. Nos. 701-TA-490 and 731-TA-1204 (Final) PD 152 at bar code 518098 (Sept.

12, 2013) (ECF Dkt. No. 58-1) ("Pl.'s Pre-Hearing Br."); Am. Def.-Ints.' Pre-Hearing Br., Inv.

Nos. 701-TA-490 and 731-TA-1204 (Final) CD 322 at bar code 518031 (Sept. 11, 2013) (ECF

Dkt. No. 58-1) ("Am. Def.-Ints.' Pre-Hearing Br."); Pl.'s Post-Hearing Br., Inv. Nos. 701-TA-

490 and 731-TA-1204 (Final) CD 329 at bar code 519156 (Sept. 25, 2013) (ECF Dkt. No. 44

Tab 3) ("Pl.'s Post-Hearing Br."); Am. Def.-Ints.' Post-Hearing Br., Inv. Nos. 701-TA-490 and

731-TA-1204 (Final) CD 325 at bar code 519112 (Sept. 25, 2013) (ECF Dkt. No. 58-3) ("Am.

Def.-Ints.' Post-Hearing Br."); Chinese Def.-Ints.' Post-Hearing Br., Inv. Nos. 701-TA-490 and

731-TA-1204 (Final) CD 326 at bar code 519113 (Sept. 25, 2013) (ECF Dkt. No. 61 Tab 2)

("Chinese Def.-Ints.' Post-Hearing Br.").  The Commission issued its Final Staff Report on

October 25, 2013.  *See* Final Staff Report.

On November 5, 2013, the ITC reversed course and determined that the plywood industry

in the United States was not materially injured or threatened by material injury by reason of

hardwood plywood imports from China.  *See Final Determinations*, 78 Fed. Reg. at 76,857 ("On

the basis of the record developed in the subject investigations, the [Commission] determines . . .

that an industry in the United States is not materially injured or threatened with material

injury.").  Plaintiff contests the Commission's final negative material injury and threat of

material injury determinations before this court.

This court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012).


## STANDARD OF REVIEW

When reviewing the Commission's material injury determinations, "[t]he court shall hold

unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i)

(2012).  "Substantial evidence is defined as 'more than a mere scintilla,' as well as evidence that

a 'reasonable mind might accept as adequate to support a conclusion.'"  *Mukand, Ltd. v. United

States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305

U.S. 197, 229 (1938)).


## DISCUSSION

### I.   LEGAL FRAMEWORK

In an unfair trade proceeding, the Department of Commerce determines whether the

subject merchandise was sold at less than fair value in the United States and/or whether the

subject merchandise has benefited from countervailing subsidies.  If the goods are sold at less

than fair value, Commerce will calculate an antidumping duty rate.  *See* 19 U.S.C. § 1673 ("If

[Commerce] determines that a class or kind of foreign merchandise is . . . sold in the United

States at less than its fair value, and the Commission determines that an industry in the United

States is materially injured, or is threatened with material injury . . . by reason of imports of that

merchandise . . . then there shall be imposed upon such merchandise an antidumping duty.").  If

the subject goods are found to be unlawfully subsidized by a foreign government, Commerce

will calculate a countervailing duty rate.  *See id.* § 1671(a) ("If [Commerce] determines that the

government of a country . . . is providing . . . a countervailable subsidy with respect to the

manufacture, production, or export of a class or kind of merchandise imported . . . into the

United States, and . . . the Commission determines that an industry in the United States is

materially injured, or threatened with material injury . . . by reason of imports of that

merchandise . . . then there shall be imposed upon such merchandise a countervailing duty.").

The Commission's role is to determine whether the subject merchandise that was sold at

less than fair value, or benefited from countervailing subsidies, materially injured or threatens to

materially injure a domestic industry.  *Swiff-Train Co. v. United States*, 793 F.3d 1355, 1359

(Fed. Cir. 2015).  When making an affirmative material injury determination, "the Commission

must find: (1) a 'present material injury or a threat thereof,' and (2) causation of such harm by

reason of subject imports."  *Tropicana Prods., Inc. v. United States*, 31 CIT 548, 550, 484 F.

Supp. 2d 1330, 1333 (2007) (quoting *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208,

1210, 431 F. Supp. 2d 1302, 1306 (2006)).  To determine whether a domestic industry is

materially injured or threatened by material injury by reason of subject imports, the Commission

must consider "(I) the *volume* of imports of the subject merchandise, (II) the effect of imports of

that merchandise on *prices* . . . for domestic like products, and (III) the *impact* of imports of such

merchandise on domestic producers of domestic like products . . . in the context of production

operations within the United States."  19 U.S.C. § 1677(7)(B)(i)(I)–(III) (emphases added).  The

statute further provides that the ITC "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports," and "shall . . . *identify each factor* . . . and *explain in full its relevance* to the determination."  *Id.* § 1677(7)(B)(ii) (emphases added).

When analyzing material injury, "substitutability is one factor in the evaluation of volume and price."  *R-M Indus., Inc. v. United States*, 18 CIT 219, 226 n.9, 848 F. Supp. 204, 210 n.9 (1994) ("Analysis of substitutability varies according to the context of its application.").[4] Importantly, the Commission is required to evaluate the impact of the imports "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii)(V); *Gen. Motors Corp. v. United States*, 17 CIT 697, 707, 827 F. Supp. 774, 784 (1993) (finding that price effects were not significant because "competition in the [domestic] industry was more a matter of features than price," and "when

---

[4]        As this court has noted, in *R-M Industries, Inc.*, the term "substitutability" has different meanings in different contexts.  *R-M Indus.*, 18 CIT at 226 n.9, 848 F. Supp. at 210 n.9. For example, Commerce determines the "substitutability" of a product when it defines "domestic like product."  19 U.S.C. § 1677(10) (A "domestic like product" is "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."); *R-M Indus.*, 18 CIT at 226 n.9, 848 F. Supp. at 210 n.9 ("For the purposes of defining 'like product' as described in 19 U.S.C. § 1677[ ], it is not necessary that like products be completely substitutable, only that the like product be 'like, or in the absence of like, most similar in characteristics and uses.'" (citation omitted)); *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 39 CIT __, __, 100 F. Supp. 3d 1314, 1320 (2015) (defining a domestic like product is a factual finding made by the Commission).
        The term "substitutability" is also used when the Commission is to decide whether to "cumulatively assess the volume and effect of imports of the subject merchandise" from other countries where there were petitions filed or investigations initiated.  19 U.S.C. § 1677(G); *R-M Indus.*, 18 CIT at 226 n.9, 848 F. Supp. at 210 n.9 ("For purposes of cumulation, the analysis of substitutability is also not stringent, as only a 'reasonable overlap' in competition is required where like product imports 'compete with each other and with like products of the domestic industry.'").

products are highly differentiated, price is less likely to determine product selection."); *see*

*generally Feldspar Corp. v. United States*, 17 CIT 617, 622, 825 F. Supp. 1095, 1099 (1993).


II.   **THE COMMISSION'S MODERATE SUBSTITUTABILITY DETERMINATION IS
      SUPPORTED BY SUBSTANTIAL EVIDENCE**

In its Final Determinations, the Commission determined the domestic hardwood plywood

industry was neither materially injured nor threatened by material injury by reason of the subject

imports.  Views at 3.  As part of its determinations, the Commission evaluated several

"conditions of competition," and in particular substitutability.  Views at 21, 23; *see* 19 U.S.C.

§ 1677(7)(C)(iii)(V).

According to the Commission, the record indicated that the domestic product and the

subject imports often have different end uses, and imports of Chinese plywood are largely used

in the lower-end of the market.  Def.'s Br. 1; Views at 26 ("[S]ubstitutability between the

domestic like product and subject imports is limited because of variations in various product

characteristics, resulting in reports by importers and purchasers that the domestic like product

and the subject imports are often used for different applications.").  The Commission argues that

it took into account overall thickness, core material, and face veneer thickness, as well as the

views of U.S. producers, importers, and purchasers when reaching its findings.  Def.'s Br. 16–21.

Specifically, defendant notes that in addition to overall thickness, core material, and face veneer

thickness, it analyzed the producers', importers', and purchasers' questionnaire responses

regarding specific physical characteristics of the hardwood plywood.  This included lengths and

widths, wood species, core construction, face and back veneer thickness, panel strength,

tolerances for moisture content, glues, quality, and availability, which led to the ITC's ultimate

finding that the subject merchandise is only moderately substitutable with the domestic product.

Def.'s Br. 16; Views at 26.  The Commission concluded that, although a finding of

substitutability was supported by its findings that pricing was an important factor in purchasing

decisions and there was some overlap in the products' panel thicknesses, these factors were

outweighed by product differences in core material, face veneer thickness, and overall quality.

Def.'s Br. 17; Final Staff Report at II-37 ("Substitutability is enhanced by the fact that price was

a very important factor in purchasing, but is constrained by quality being the most important

factor for more purchasers.  Also, there are clear differences in face thickness and core material

between U.S.-produced product and subject imports from China.").  In other words, even though

the Commission found that the overall thicknesses of the two products overlapped in some

instances, it found the two products were not highly substitutable because of the domestic and

Chinese products other differentiating physical characteristics, variations in quality, and different

end-use applications.

        Plaintiff's primary argument is that, while the Chinese plywood is not directly

substitutable in all cases, the products are similar enough that U.S. purchasers buy the lower-

priced and lower-quality Chinese plywood in place of the more expensive, higher-quality U.S.

plywood—making price, not physical characteristics, the most important substitutability

consideration.  *See* Pl.'s Br. 7, 16; Pl.'s Post-Hearing Br. 4 ("Petitioners believe that many

purchasers make similar calculations for many end-uses, seeking out the lowest-priced product

that meets the requirements of the application, and finding that the Chinese product is that

lowest-price product.").  Put another way, for the Coalition, while the Chinese plywood may not

be suitable for decorative applications requiring sanding or other modifications, the Chinese

plywood has displaced the U.S. produced plywood in the remaining areas of the market, i.e. non-

decorative applications.  Importantly, to plaintiff, had the ITC concluded the goods were directly

substitutable, its subsequent conclusions regarding volume, effect of imports on price, and

impact of imports on domestic producers would have led to a different conclusion, i.e., that

Chinese products caused material injury to the domestic industry.  *See* Pl.'s Br. 17.


### A. The Commission's Selection of Cabinetry as the End-Use Analyzed to Determine Substitutability Is Supported by Substantial Evidence

As an initial matter, the Coalition objects to the Commission's reliance on only the

plywood that is used to make cabinets, and argues for an analysis that examines the rest of the

plywood market.  Pl.'s Reply to Def. & Def.-Ints.' Resps. in Opp'n to Pl.'s Rule 56.2 Mot. for J.

Upon the Agency R. 7 n.7 (ECF Dkt. No. 64) ("Pl.'s Reply Br.") ("[A]s acknowledged by the

Commission, no more than one-third of imported hardwood plywood (and 30 percent of

domestically-manufactured hardwood plywood) is used for cabinetry.  That leaves a substantial

portion of the end-use markets—representing the majority of the hardwood plywood in the

commercial market—unaddressed." (citation omitted)).  Plaintiff further contends that the issue

of cabinetry comprising only 30 percent of domestically-manufactured hardwood plywood is

similar to the issue that "was central to the Federal Circuit's affirmation of this Court's remand

to the Commission for further discussion and evaluation in *Diamond Sawblades Manufacturers

Coalition v. United States*."  Pl.'s Reply Br. 7 n.7; *see Diamond Sawblades Mfrs. Coal. v. United

States*, 612 F.3d 1348, 1359 (Fed. Cir. 2010) ("[T]he [C]ourt pointed out that the data to which

the Commission cited in support of its finding that 'nearly half' of the subject shipments were in

smaller sized blades . . . also showed that the other half of both subject and domestic imports

were concentrated in the two middle diameter ranges," and, therefore, the Court's remand of the

ITC's "confusing and potentially incorrect analysis was not an abuse of discretion" (citation

omitted)).

The court finds that the Commission reasonably based its substitutability analysis on the

cabinetry market, and its finding is supported by substantial evidence in the record.  *See* Views at

21; Final Staff Report at II-9 ("Petitioners and respondents indicate that cabinets are the largest

end use for both domestic and imported products.  Many producers, importers, and purchasers

reported that this end use was among their top three end uses.").  The Commission further found

that "cabinets [are] the largest market segment in which imported hardwood plywood is used and

the second largest in which U.S. produced [hardwood plywood] is used."  Def.'s Br. 17; Final

Staff Report at II-10 fig. II-1.  The ITC's discussion is particularly reasonable considering the

fragmentation of the remainder of the hardwood plywood market.[5]  The only application that

approximates cabinets in terms of consumption of domestic hardwood plywood is that for retail

fixtures (i.e., shop displays), which comprises 35 percent of the U.S. market.  No other

application comprises more than 13 percent of the market.  The ITC based its analysis on the

finding that 30 percent of U.S. hardwood plywood is used in cabinetry and 34 percent of

imported Chinese hardwood plywood is used in cabinetry.  *See id.*  That is, the data reflect that

---

[5]        Domestic producers' hardwood plywood is also used in other applications,
including retail fixtures (35 percent), architectural work (13 percent), furniture (10 percent), RVs
and mobile homes (4 percent), miscellaneous applications (5 percent), and underlayment (3
percent).  Final Staff Report at II-10 fig. II-1.  Imported hardwood plywood is used in
underlayment (18 percent), RVs and mobile homes (12 percent), furniture (12 percent), general
use (17 percent), and store fixtures (7 percent).  *Id.*  Testimony at the hearing explained how
plywood is used in cabinets.  *See* Final Phase Hearing Tr. 188 ("We use Chinese plywood
exclusively for our plywood cabinet interiors and some drawer parts.  We use domestic for all
exterior surfaces, primarily being doors, finished ends, finished backs, and cabinet interiors that
need to match the exterior.").  Retail fixtures are the largest market segment of the domestic
hardwood plywood industry, and are typically of a higher "display quality" than those produced
in China.  Am. Def.-Ints.' Pre-Hearing Br. 63.  In other words, "[t]his 'display quality' end use is
a segment of the market that is predominantly served by the domestic market and is not in
competition with Chinese plywood."  *Id.*  According to the American defendant-intervenors,
"[t]here are two segments of the market, a high-end one where the beauty of the wood is
paramount, and a lower-end one where a laminated product will suffice."  *Id.* at 64.

the U.S. cabinet market was the largest segment of the market where the domestic and Chinese

products overlapped, and, accordingly, the Commission reasonably relied on information from

this segment of the market to determine substitutability.

In *Diamond Sawblades*, the Federal Circuit affirmed this Court's finding that the

Commission's explanation "that 'nearly half' of the domestic shipments were in smaller sized

blades, while 'nearly half' of domestic shipments were of larger sized blades" did not justify its

limited competition finding.  *See Diamond Sawblades*, 612 F.3d at 1359.  Hence, the Federal

Circuit affirmed the CIT's decision to remand, finding that, in addition to blade size, "neither

blade type nor manufacturing process significantly limited competition."  *See id.*  Unlike in

*Diamond Sawblades*, here, the Commission has explained, in detail, and supported with

substantial evidence, the physical differences and purchasing considerations that distinguish the

two products from one another.  Using the cabinet industry as a lens to view these distinctions

was reasonable because it was the largest overlapping market segment of both the domestic and

imported products, and it was a market in which the Chinese hardwood plywood was focused.

*See* Views at 21 ("The largest market segment for U.S. importers of hardwood plywood, and one

of the largest for U.S. producers as well, is cabinetry.").


**B.  The Commission's Findings as to Overall Thickness Are Supported by Substantial Evidence**

When comparing the physical characteristics of U.S. and Chinese hardwood plywood, the

Commission found that the domestically-produced plywood is generally thicker (at least 16 mm

in overall thickness) than the imported product and is used for cabinet fronts and sides, whereas

the Chinese hardwood plywood is generally thinner (less than 6.5 mm in overall thickness) and is

used for "interiors, backs, and drawer bottoms of cabinets."  Views at 25; *see* Final Staff Report

at D-6 tbl. D-4.  In its overall thickness finding, the Commission compared the percentage of

domestic production of hardwood plywood of various thicknesses to the percentage of imported

subject merchandise of various thicknesses to determine the degree of overlap in thicknesses.

Views at 25.  In its findings, the Commission acknowledged there was some overlap in

thicknesses between the two products, but found that any overlap in thickness was outweighed

by other distinguishing factors between the two products.  Def.'s Br. 17 ("'[S]ome overlap in

panel thickness does suggest substitutability between U.S.-produced product and imports from

China, [however], this is moderated by the higher importance of quality and importance and

differences in veneer thickness and core material.'" (quoting Final Staff Report at II–37–38)

(emphasis omitted)); *see also* Final Staff Report at D-6 tbl. D-4 (reflecting U.S. producers', U.S.

importers', and Chinese producers' commercial shipments by overall thickness of the plywood).

The ITC found that thickness, in particular, was important in determining the end use of

the plywood.  Although the overall thicknesses of plywood ranged from 6.5 mm or less to 20

mm or more, the Commission's analysis focused on thicknesses of 6.5 mm or less and 16 mm or

more.  This was based on its conclusion that the Chinese product is predominately produced with

a thickness of 6.5 mm, while U.S. producers predominately produce plywood of 16 mm.  *See*

Views at 25; Final Staff Report at D-6 tbl. D-4.  Thus, the Commission concluded that different

overall thicknesses led to different end uses, and these different end uses were concentrated in

different areas of the market: "thicker plywood is used in cabinet fronts and sides, while thinner

plywood is used for cabinet backs, drawer bottoms, paneling, and underlayment."  Views at 25.

The Commission supported its finding of moderate substitutability by considering

questionnaire responses that reflected that thickness largely dictates end use.  *See id.*  The

responses relied upon by the Commission were those of U.S. importers,[6] Chinese producers of

subject U.S. imports, and domestic producers.  *Id.* at 4.  For example, for the 2012 calendar year,

the Commission compared total U.S. production of 16 mm plywood, which constituted 58

percent of production, to the total percentage of U.S. importers' commercial shipments of

Chinese plywood of that same thickness, which was 21 percent of total imports.  *Id.* at 25; Final

Staff Report at D-6 tbl. D-4.  The Commission also found the data reflected that "U.S. producers'

shipments of thin plywood (less than 6.5 mm) accounted for 21 percent of their total shipments

in 2012, as compared to 45 percent of U.S. importers' commercial shipments of [Chinese

plywood]."  Views at 25; Final Staff Report at D-6 tbl. D-4.  For the Commission, because only

21 percent of U.S. production had a thickness of 6.5 mm or less, production of thin plywood only

slightly overlapped with U.S. importers' commercial shipments of Chinese plywood.[7]  *See*

Views at 26.

Additionally, the Commission's undisputed finding that the U.S. and Chinese products

have different end uses based on overall thickness was based on surveys of U.S. purchasers.  *See*

Final Staff Report at E-3–E-6 tbl. E-1; Pl.'s Pre-Hearing Br. 17 ("Petitioners acknowledge that

there may be a subset of end-use applications for which there is a functional or other non-price

reason for a U.S. purchaser to purchase plywood with . . . a particular overall thickness, and that

---

[6]        In its Views, the Commission states that for U.S. import data it relied on questionnaire responses and official U.S. import statistics; however, the chart relating to overall thickness provided in the Final Staff Report reflects that the data compiled for overall thickness was derived from questionnaire responses.  *See* Views at 4; Final Staff Report at D-6 tbl. D-4.

[7]        Why Chinese producers reported that 45 percent of their exports of subject merchandise were of the thinner plywood, while U.S. importers of Chinese plywood reported that only 33 percent of their Chinese imports were of the thinner variety, remains a bit of a mystery.  *See* Final Staff Report at D-5 tbl. D-4.  One explanation may be that not all producers or importers answered the questionnaires, and so the experience of the individuals may not give an accurate picture of the entire universe of producers or exporters.

in certain of these cases the required product may be available only from Chinese sources.").  In

other words, at least with respect to cabinetry, the parties agree that the plywood's overall

thickness largely determines how and where the plywood will be used in the market.

The parties disagree, however, about the weight that the Commission assigned to the

Chinese producers' production of thicker plywood, and the U.S. producers' production of thinner

plywood.  Pl.'s Br. 12–13.  Specifically, the Coalition argues that thickness is the most important

physical characteristic of hardwood plywood, and the overlap in overall thickness, recognized by

the Commission, should have been enough for the Commission to find that the goods were

substitutable.  Pl.'s Br. 12–13.  The Coalition further argues that the data relied on by the

Commission shows there is a more significant overlap in production of certain thicknesses

between the domestic product and the subject imports than the Commission acknowledges.  Pl.'s

Br. 13.

> In 2012, more of U.S. producers' commercial shipments (58 percent) were reported
> to be of thicker plywood (at least 16 mm) than were U.S. importers' commercial
> shipments of subject Chinese imports (21 percent) and Chinese producers' U.S.
> exports (42 percent).  U.S. producers' shipments of thin plywood (less than 6.5 mm)
> accounted for 21 percent of their total shipments in 2012, as compared to 45 percent
> of U.S. importers' commercial shipments of subject imports and 33 percent of
> Chinese producers' U.S. exports to the United States.

Views at 25.

Although seemingly accepting the percentages cited by the ITC, the Coalition disputes

the idea that the numbers indicate only a moderate overlap of plywood by thickness.  For the

Coalition, "the percentages cited do not support the subsidiary finding that domestically-

manufactured hardwood plywood is geared toward thicker products, while subject imports are

predominant in thinner plywood."  Pl.'s Br. 12.  Thus, the Coalition contends that a proper

analysis of this data requires that the U.S. producers' total production be compared with the

Chinese producers' total U.S. exports, not the U.S. importers' imports.  Pl.'s Br. 12–13 ("[It]

comes down to the difference between 58 percent versus 42 percent for 'thicker' plywood, and

21 percent versus 33 percent for 'thinner' plywood."); Pl.'s Pre-Hearing Br. 15 (arguing both

parties possess a "significant 'market share' in each segment"); Final Phase Hearing Tr. at 61

("Even for products where either the domestic industry or subject imports are relatively more

concentrated, the other has a substantial presence.  For example, in thicknesses 20 millimeters

and above, despite a relatively high domestic concentration, subject imports still supplied 19.8

percent of the volume over the POI.").  Thus, interpreting the same data, the Coalition argues the

degree of overlap is more significant than the Commission's findings reflect, and this significant

overlap suggests a greater degree of substitutability.

     The court finds that the ITC's thickness conclusion used in its substitutability findings

was supported by substantial evidence.  *See* Views at 26 ("[S]ubstitutability between the

domestic like product and subject imports is limited because of variations in various product

characteristics, resulting in reports by importers and purchasers that the domestic like product

and the subject imports are often used for different applications.").  Initially, the Commission

and plaintiff agree that there is some overlap with regard to the thickness of the domestic and

Chinese product, such that both producers supply the United States with products of similar

thicknesses.  Additionally, both parties agree that depending on the plywood's overall thickness,

these products potentially have different end uses.  After considering the information in the

questionnaire responses, the ITC found that, while both U.S. and Chinese producers make

products of various thicknesses, each country generally concentrated production on different

thicknesses of plywood.  In other words, even though 21 percent of the domestically-produced

plywood had an overall thickness of 6.5 mm and below, over half of the domestic plywood

production was greater than 16 mm.  This finding was borne out by the data.  Moreover, it was

reasonable for the ITC to rely on data comparing the domestic producers' overall production to

official U.S. import data, rather than the Chinese producers' overall production.  This

information gives a more accurate picture of the subject merchandise in the U.S. market.  Even

taking into account plaintiff's view of the information, it is clear that domestic U.S. production is

concentrated toward the higher-end of the thickness range, while imports were concentrated

toward to the thinner end.  *See* Final Staff Report at D-6 tbl. D-4 (table reporting percentages of

overall thicknesses from U.S. purchasers, U.S. importers, and Chinese producers).

   Accordingly, while recognizing some overlap in plywood thickness, it is clear that U.S.

production is concentrated in plywood with greater thicknesses, Chinese imports are

concentrated in the thinner product, and overall thickness dictates end use.  Therefore, as to

overall thickness, the ITC has supported with substantial evidence its conclusion that

"substitutability between the domestic like product and subject imports is limited because of

variations in various product characteristics," but that "there is some overlap between the

domestic like product and the subject imports across many of these product characteristics."  *See*

Views at 26.


   **C.    The Commission's Findings as to Core Material Composition Are Supported
           by Substantial Evidence**

   The Commission found that the two product's core material composition is a

distinguishing characteristic because the Chinese product's core material is composed of

different types of wood, and is manufactured differently from the domestic product.  Views at

23–24.  The Commission further found that the core material affects end-use applications and

appropriate thicknesses of face veneers.  *Id.* ("[For the Chinese product,] smaller logs are

typically utilized to manufacture veneer for the plywood core, and the quality of veneer is

typically lower than for the domestically produced product.  The Chinese product is typically

manufactured utilizing more labor and less automation . . . .  Depending on the market segment

in which hardwood plywood is used, various attributes may be preferable or required.").  Based

on these observations, the ITC found that core composition also tended to support a finding of

limited substitutability.  *Id.* at 25–26.

First, the Commission found that the core materials directly differ.[8]  *Id.* at 25; Def.'s Br.

18–19 ("The record also indicates that type of core (veneer, particleboard, [medium density

fiberboard], or other material) is one of the ways in which [hardwood plywood] products are

differentiated.").  It found that domestic plywood core tended to be softwood plywood, where the

Chinese plywood core is generally hardwood.[9]  Views at 25.  The ITC further found that

differences in core material direct different end use applications.[10]  *Id.*; Final Staff Report at II-

35 ("Three purchasers pointed to differences in the core material and/or the thinner veneer face

of the subject product that make it[ ] more suitable for applications not requiring sanding and

---

[8]      The different types of wood used for the core material also yield different
qualities of wood.  For example, "[p]etitioners indicated that approximately half or more of a log
peeled for veneer in the United States will yield C grade or below ([about] 45–60 percent), with
the yield of A grade veneer in the range of 9–14 percent, and the balance in B grade material."
Final Staff Report at I-12.  Respondents also "indicated that fast-growing species of the kind
used to manufacture subject imports, such as poplar and eucalyptus, are smaller and yield a much
higher percentage of lower grade veneers."  *Id.* at I-12–I-13.

[9]      Data showed U.S. producers use a softwood core two-thirds of the time, and one-
third of the time they use other alternatives, while Chinese producers almost always use
hardwood as the core material.  Final Staff Report at II-33–34, D-3 tbl. D-1.

[10]      "The different raw material species available for the Chinese product lead to
different plywood veneer cores, and thus different performance capabilities and, ultimately,
different end uses.  The different varieties of core material between domestic product and
Chinese imports limit the substitutability of the products."  Am. Def.-Ints.' Pre-Hearing Br. 10.

finishing."). In its Views, the Commission relied on the testimony from an importer that

indicated that the Chinese product consistently lacked core quality, resulting in plywood of lower

quality that easily breaks and warps. Views at 24 n.83.

Second, the Commission found the Chinese and domestic product's core is manufactured

differently, and this manufacturing impacts core material composition. *Id.* at 23 ("The Chinese

product is typically manufactured utilizing more labor and less automation, particularly for

repairing defects, preparing veneers, and laying up veneer sheets for pressing."); Final Staff

Report at I-15–I-16 ("Smaller logs are typically utilized to manufacture veneer for the plywood

core and the quality of veneer is typically lower."); Final Phase Hearing Tr. at 179 (testimony of

Greg Simon, Vice President of Far East American, Inc.) ("Simon Testimony") ("[T]he Chinese

product uses a large number of thinner layers of veneer. The domestic core veneer layers are

much thicker and there are fewer of them.").

Significantly, hearing testimony relied on in the Final Staff Report shows that producers

of the subject imports use a two-step process that involves manually piecing the core together,

and then running the plywood through a calibration sander. Simon Testimony at 175–76; Final

Phase Hearing Tr. at 224. The domestic producers, on the other hand, use a one-step process

employing core composing machines. Simon Testimony at 176–77. The Commission further

found that the use of different types of wood and different manufacturing processes partially

determines whether the product has a thick or thin face veneer. Views at 25.

Defendant-intervenor's argument further draws a correlation between core material

composition and face veneer thickness: "The domestic producers utilizing softwood for core

veneers are limited to thicker plies which lead to a core platform that is not smooth enough to use

a thin-gauge face veneer. This difference in the raw material used to make the core translates

directly into differences in the manner in which the finished products can be used . . . ."  Am.

Def.-Ints.' Pre-Hearing Br. 11–12.  Further, for the American defendant-intervenors, the record

supports that differences in core composition, i.e. how the core is manufactured, determines the

face veneer thickness.  *See* Am. Def.-Ints.' Pre-Hearing Br. 13–16.  Therefore, according to the

American defendant-intervenors, the type of core favored by U.S. manufacturers requires

application of a thick face veneer, the kind of veneer better suited for sanding and finishing, and

hence is used in higher-end applications.

The Coalition asserts there is no evidence demonstrating that core material is significant

in purchasing decisions.  Pl.'s Br. 13.  Put another way, for plaintiff, the differences in core

material and the manufacturing processes do not impact how the imported and domestic products

are used, and do not cause a purchaser to buy the Chinese product rather than the domestic

product.  Specifically, plaintiff argues that only one-third of respondents ranked core material as

"very important."  Pl.'s Pre-Hearing Br. 17.  Plaintiff also asserts that fifteen out of thirty-one

purchasers reported comparable core material between the domestic and Chinese products.  Pl.'s

Pre-Hearing Br. 17.  Last, the Coalition argues that although the Commission pointed to

differences in core material composition between the two products, it failed to show how these

differences affect end use.  Pl.'s Br. 13; Final Staff Report at E-3–E-6 tbl. E-1 (stating that "core

thickness" can determine whether to use the product as cabinet fronts, not specifically

mentioning core material, and reiterating that overall thickness is the most determinative

physical characteristic for end use).

The court finds that the Commission's consideration of core material composition as a

factor limiting substitutability is supported by substantial evidence.  The record demonstrates

that the types of wood used for the core material in U.S. and Chinese plywood are different.

Views at 25.  In 2012, core material data showed 68.1 percent of domestically-produced hardwood plywood was reported to have a softwood veneer core, compared with only 8.3 percent of Chinese hardwood plywood.  *Id.*  Likewise, only 3.8 percent of domestically-produced hardwood plywood was reported to have a hardwood veneer core, compared with 88.4 percent of Chinese hardwood plywood.  *Id.*  The evidence also reflects that different softwood and hardwood core material have different advantages; for example, "Chinese plywood cores [have] several advantages over typical domestic softwood cores, including: less weight; increased strength; greater bending strength; and greater screw withdrawal ability."  Am. Def.-Ints.' Pre-Hearing Br. 10–11.

In addition, as will be discussed, the record further supports the Commission's finding that differences in core composition, and how the core is manufactured, determine the plywood's face veneer thickness, thus limiting substitutability.  *Cf.* Views at 25 ("Some purchasers pointed to differences in the core material/quality and/or the thinner veneer face of the subject product as making it more suitable for applications not requiring sanding and finishing or for laminated applications.").  Thus, because it is better suited for sanding and finishing, the thicker face veneer required for the type of core preferred by the U.S. market makes the product better suited for the exterior of cabinets.

Further, hearing testimony reflects that the two products are manufactured differently.  Simon Testimony at 175–77.  The record supports that the differences in manufacturing processes of the core material is a reason why U.S. plywood has a thicker face veneer and Chinese plywood has a thinner face veneer.  Am. Def.-Ints.' Pre-Hearing Br. Ex. 4, Aff. of George Simon ¶ 11 ("Simon Aff.").  As a result of the two manufacturing processes and face veneer thicknesses, core material imperfections are not a concern for the domestic producers

because their plywood has a thick face veneer, allowing for repair of any imperfections. Simon

Testimony at 177.

Finally, the record demonstrates that this difference in core material composition matters

to purchasers. Data in the record shows only three U.S. purchasers ranked core material

composition as not important, nineteen ranked it as "very important," and eighteen ranked it as

"somewhat important." Final Staff Report at II-19 tbl. II-7, II-37 ("Core material species was a

very important factor to just under one-half of responding purchasers and at least a somewhat

important factor to all but three purchasers."). Moreover, the record reflects that "[i]mporters

and purchasers reported that interchangeability between various sources including domestic and

Chinese hardwood plywood is limited by . . . differing characteristics such as wood species [and]

core construction." *Id.* at II-28.

Accordingly, the Commission's findings that the two products used different types of

wood for the core material, that this difference in material together with differences in

manufacturing processes lead to different face veneer thicknesses, and that the resulting products

are preferred for different end-uses, are supported by substantial evidence.


### D.    The Commission's Finding as to Face Veneer Thickness Limiting Substitutability Is Supported by Substantial Evidence

As noted, the Commission found that face veneer thickness is a distinguishing

characteristic and a significant purchasing factor between domestic and Chinese hardwood

plywood. The Commission's findings reflect that the Chinese product's face veneer is almost

always thinner than the domestic product's face veneer, which makes the Chinese product better

for laminating applications and the domestic product more suitable for decorative applications.

Views at 24–25 ("[D]omestic and Chinese hardwood plywood[ ] is limited by factors that

include . . . face and back veneer thicknesses," and "the thinner veneer face of the subject

product [makes] it more suitable for applications not requiring sanding and finishing or for

laminated applications.").

First, the Commission argues that its finding was supported by substantial evidence

because the data shows that face veneer thickness is "very important" or "somewhat important"

for every U.S. purchaser surveyed.  Final Staff Report at II-19 tbl. II-7 (Twenty-five respondents

answering "very important" and fourteen respondents answering "somewhat important.").[11]  In

addition, although the basic steps in the manufacturing process were similar, the Commission

found there were some differences in manufacturing with regard to the face and back veneers.

Views at 23 ("[T]he record shows that Chinese manufacturers use thinner face and back veneers

that are laid up moist or wet to prevent splitting or breaking prior to being pressed. . . .  The

Chinese product is typically manufactured utilizing more labor and less automation, particularly

for repairing defects, preparing veneers, and laying up veneer sheets for pressing.").

It is end use, however, that most distinguishes products having thick and thin face

veneers.  For the Commission, substantial evidence in the record, having to do with how the

domestic versus the Chinese product is employed, demonstrated that face veneer thickness is a

determinative factor in end-use applications.  That is, thicker face veneers are used in higher-end

---

[11]     The court notes that the information in the Department's table does not
correspond to the number of purchasers surveyed, totaling forty.  *See* Final Staff Report at II-19
tbl. II-7.

products and thinner face veneers are used in lower-end products.[12]  Views at 25; Final Staff

Report at II-35, E-3 tbl. E-1; Def.'s Br. 19 ("Because of the differences between the domestically

produced product and subject imports, including core material/quality and/or thinner veneer face

of the subject product, some purchasers indicated that the two products are often used for

different components of the same end product, particularly in cabinets.").

For example, because of the thin face veneer and core construction, the Chinese product

is "ideal for applying a UV clear-coat, vinyl overlays, and other laminating processes.  Final

Phase Hearing Tr. 189 (Bill Weaver, CEO of Canyon Creek Cabinet Company) ("Weaver

Testimony") (noting, by way of contrast, that the domestic product is superior, and preferable for

finishing processes that include sanding, staining, and further cosmetic work); Views at 25

("Some purchasers pointed to differences in the . . . thinner veneer face of the subject product as

making it more suitable for applications not requiring sanding and finishing or for laminated

applications.").

The Coalition argues that face veneer thickness is not a distinguishing factor in

purchasing decisions, and that overall thickness is determinative for substitutability.  Plaintiff

points to the fact that "31 of 37 purchasers indicated that panel thickness is a very important

factor in their purchases."  Pl.'s Pre-Hearing Br. 14 (internal quotation marks omitted); Final

Staff Report at II-19 tbl. II-7 (responses of U.S. purchasers reflected thirty-three out of forty

purchasers ranked panel thickness as "very important," seven out of forty ranked panel thickness

---

[12]        "Hardwood plywood is also used in some construction-related applications where structural strength and moisture resistance is a requirement, such as for providing a flat, stable underlayment for a finished flooring product."  Final Staff Report at I-11.  Defendant also argues that applications such as underlayment are more suitable for plywood with a thinner face veneer. Only "[t]hree percent of U.S. produced [plywood] . . . is used for underlayment, while 18 percent of imported [plywood] is used in that market segment."  Def.'s Br. 20 n.13.

as "somewhat important," but only twenty-five out of forty ranked veneer thickness as "very

important," and fourteen out of forty ranked it as "somewhat important").  Moreover, for the

Coalition, the overall functionality of hardwood plywood depends on its overall thickness, not

face veneer thicknesses.  Pl.'s Pre-Hearing Br. 14–15, 30.  Plaintiff, in support of its argument,

quotes a portion of the hearing transcript stating "[a] thin-faced veneer is acceptable in certain

instances."[13]  Pl.'s Post-Hearing Br. 5 (quoting Weaver Testimony at 237); Final Phase Hearing

Tr. at 54 (The "face veneer thickness assertion is simply a red herring.  You buy it because of the

look and the thickness.  This is U.S.-made, less than .4 [mm] of veneer thickness; Chinese made,

.4 [mm] veneer thickness.  You can't tell the difference.  You're buying the look."); Final Phase

Hearing Tr. 55–56 ("I've never seen a label on a Chinese hardwood plywood that specified a

thin-faced veneer.  [For example,] [t]his hardwood plywood is .4 millimeter or .3 millimeter

face. . . .  What I do see are nominal thicknesses designated three-quarter inch, 23/32ns, half-

inch, et cetera, or in millimeters, 5.0, 5.5, 9.0, 15.").

      The court finds that the Commission's conclusion that face veneer thickness is a

determinative physical characteristic for substitutability is supported by substantial evidence.

Questionnaire responses report that "the [imported] subject product is better suited for laminated

applications," which makes the plywood more suitable for cabinet interiors.  Final Staff Report at

II-35.

---

[13]      The full language from the transcript is: "I do not think that the thickness, the
thinness of the face veneer on the Chinese panel is what gives the product from China the
superior quality.  It's what is underneath that. . . .  A thin-faced veneer is acceptable in certain
instances."  Final Phase Hearing Tr. 236–37.  Defendant responds to the Coalition's assertion
that face veneer thickness is not important, arguing that the language "certain instances" is
unclear, and these "certain instances" may be exactly what was highlighted in the questionnaire
responses, i.e., a thin face veneer is appropriate when it does not need to be sanded or altered for
decorative purposes.  Def.'s Br. 20.

> While domestically produced plywood may be sufficient in many applications, there are just as many areas where U.S. produced product is over engineered. Where thick face is not required to achieve the same end result.  In many cases domestically produced products with thicker face veneer[s] are used in highly visible areas of the finished product, where the manufacturer will need to do more sanding and surface preparation prior to finishing.[ ]  Imported products from China will normally be used in interiors of cabinets where there is less emphasis on veneer preparation.   These interior parts may also be prefinished, so no additional preparation is required . . . .

Final Staff Report at E-4 tbl. E-1 ("[The] Chin[ese] product is used for laminating paper.  [The] U.S. product is for finished veneer."; "Chinese plywood is preferred in lamination applications as the overall thickness consistency tends to be better.  For face applications, the two countries offer different advantages. . . .  Thicker face veneer offers higher repair functionality as more veneer to sand.  Either can be used, however the impact on process costs are very different."); Simon Testimony at 78 ("Domestic hardwood plywood manufacturers do not peel or slice veneer as thin as they do in China because it would deprive them of their main value-added product attribute, the ability for end users to sand and stain the product for decorative applications."); Final Phase Hearing Tr. 200 ("[T]he face veneers are substantially thicker, permitting appropriate sanding for the best finished surface on the completed cabinet.  It's this great appearance on the outside that attracts customers.").

The record supports the assertion that U.S. plywood is more suitable for decorative uses that are visible because it can be sanded and painted, while Chinese plywood is a lesser quality product which is suitable for lamination, or for the interior or non-visible part of a product.  The evidence cited by the Coalition simply does not overcome, or seriously call into question, the ITC's finding that plywood of thicker face veneer is more suitable for certain applications than that of thinner face veneer.  Thus, the record supports the conclusion that face veneer thickness is a distinguishing characteristic between domestic and Chinese plywood.

Next, as has been noted, the ITC's conclusions on differences in the manufacturing process are supported by substantial evidence in the record.  The hearing testimony described that the different manufacturing processes of the core material require the Chinese product's face veneer to be manufactured differently, making the Chinese product better equipped for laminating applications, and the domestic product more suitable for decorative applications.  *See* Simon Testimony at 176–77.  According to this testimony, because the Chinese product's core is manufactured differently, the product's face veneer is put on differently too.  *Id.*; Am. Def.-Ints.' Pre-Hearing Br. 18 ("[F]or technical reasons, there is a hard line at 0.4 mm veneer thickness that differentiates two very different production processes and that yields hardwood plywood faces and backs that are very different and that have different end uses.  For veneer that is rotary cut or plain sliced to 0.4mm's and above, a manufacturer can use an automated composer machine to stitch together the pieces of veneers in a dry lay up.  For face and back veneers that are rotary cut or plain sliced below 0.4mm, the veneer pieces must be combined by hand using a wet veneer lay up. . . .  For veneer thicknesses below 0.4mm, it would be impossible to use a machine composer.  The domestic industry uses the machine-composer and therefore must cut veneer at thicknesses above 0.4mm." (quoting Simon Aff. ¶ 11)).

Moreover, information on the record also shows that U.S. producers did not manufacture hardwood plywood with a face veneer thickness below 0.4 mm during 2010 through interim[14] 2013, while on average, 94 percent of U.S. imports of the Chinese plywood had face veneer thicknesses below 0.4 mm.  *See* Final Staff Report at D-5 tbl. D-3.  In other words, the record supports the finding that the face veneer manufacturing processes of the domestic and Chinese

---

[14]      In this context, "interim" means the months of January through June of a given year.  *See* Views at 14.

plywood differed, and because of these different processes, the domestic and Chinese producers were producing physically distinguishable products.

The Commission's findings were based on questionnaire responses and hearing testimony reflecting that face veneer thickness determines whether the plywood is appropriate for sanding or finishing, or conversely, laminating and painting.  Further, the production of different face veneer thicknesses differs between domestic and Chinese producers.  For these reasons, the Commission's conclusion that face veneer thickness is a distinguishing factor in its substitutability determination is supported by substantial evidence.

### E.    The Commission's Finding that Other Purchasing Factors Outweighed Price-Driven Substitutability Is Supported by Substantial Evidence

In its Views, the Commission found that "[a]lthough price is an important factor in purchasing decisions, quality and availability[15] are other top factors."  Views at 27.  This finding was the result of only six out of forty surveyed purchasers responding that price was the most important factor.  *Id.*; *see* Final Staff Report at II-19 tbl. II-6.  The Commission found, however, that "[s]ubject imports undersold the domestic like product in 83 of 84 price comparisons, with margins of underselling ranging from 0.9 to 56.5 percent."  Views at 30.

---

15      The Commission found that seven out of forty respondents indicated that availability was the most important purchasing factor, but only six out of the forty respondents indicated that price was the most important.  Views at 27.  Based on questionnaire responses, the ITC concluded in its Final Staff Report that "[w]hile price and quality were cited most frequently as being top factors in their purchase decisions, other factors such as availability, product consistency, and reliability of supply were cited just as often as being very important purchasing factors."  Final Staff Report at II-18.  In the Commission's consideration of change in purchasing patterns, it found that purchasers stopped purchasing or purchased less hardwood plywood from suppliers "because of price and/or quality, but some purchasers also cited reasons such as availability."  *Id.* at II-24.

The Coalition argues that the Commission should have compared the pricing data during

the POI and after the Petition was filed in its substitutability finding, and that this comparison

reflects a post-petition decrease in Chinese imports, which demonstrates purchasers' sensitivity

to price.  Pl.'s Pre-Hearing Br. 17–19.  In other words, for plaintiff, the importance of price as a

purchasing factor is demonstrated by the increased volume of Chinese products during the first

part of the POI resulting from the Chinese producers' low prices, followed by a decrease in

volume following the filing of the Petition, because of the well understood potential for price

increases for the Chinese product resulting from antidumping duties.  Notably, plaintiff

acknowledges that there may be instances where "there is a functional or other non-price reason

for a U.S. purchaser to purchase plywood with, for example, a thin face veneer, or a core made

from a particular material, or a particular overall thickness" from Chinese producers.  Pl.'s Pre-

Hearing Br. 17.  The Coalition insists, however, that this "niche" purchasing cannot explain the

increase in volume of imports of Chinese products during the beginning of the POI, and the

observed decrease after the filing of the Petition, but that the differences in price can.  Pl.'s Pre-

Hearing Br. 17–18.

For the Coalition, "if demand for Chinese hardwood plywood was driven not by price but

by demand in niche applications such [as] those that require thin-veneered plywood as a

functional characteristic, then the volume of U.S. imports of the subject merchandise would not

have dropped so precipitously" after the Petition was filed.  *Id.* at 18–19; *see also id.* at 24

("Subject import volume declined by 27 percent in Q4 2012 (after the filing of the case in Q3),

another 21 percent in Q1 2013, and yet another 26 percent in Q2 2013 (after the announcement

of the Preliminary Commerce margins). . . .  If Chinese producers truly offered a differentiated

product unavailable (or even largely unavailable) from domestic and other sources, they would

have continued to ship it to the U.S. market, and customers would have continued to purchase

it."). In making its argument, the Coalition claims that this data demonstrates price, not any

physical characteristic of the plywood, is the most important purchasing factor and should have

been given significant weight by the Commission in its substitutability analysis.

In its papers, plaintiff also presents testimony from the hearing that it claims illustrates

that the U.S. producers have the capability and the capacity to produce the same products as the

Chinese, but argues that they cannot compete with Chinese prices.[16]  *See* Final Phase Hearing Tr.

34 ("Domestic producers can make the exact same product as the Chinese, but not at the same

price. Come to our mills and see for yourself. The samples on the table that we have provided

are just examples to prove that point."), 37 ("[T]he importers of Chinese hardwood plywood

have not found a new use or a new application of their plywood. On the contrary, it's just

cheaper. Regretfully, in these especially tough economic times cheap wins."), 39 ("We can and

do manufacture thin plywood every day and can do it with thin faced veneers."), 47 ("[Thin face

veneers] cannot be sourced from domestic they say. This is a false statement. American

hardwood plywood mills and veneer manufacturers have the tools, the technology[,] and the

workforce to produce plywood."). Put another way, the Coalition argues the only reason

---

[16]        Specifically, Michael Clausen, Vice President of Sales for the Timber Products
Company, stated "[t]he total U.S. production in thousand square feet of birch plywood from
2003 to 2012 declined by 49 percent, and during that same period the total cubic meters of
Chinese plywood imported into the U.S. increased by 55 percent." Final Phase Hearing Tr. at 36
(testimony of Michael Clausen, Vice President of Sales for Timber Products Company)
("Clausen Testimony"). From his experience as both an importer and producer, Clausen testified
that the customer base is the same for both products, and the U.S. industry has the same
capabilities to make all of the same products as the Chinese producers. *Id.* at 35–37, 39
("Regretfully, we don't often get the opportunity to quote or bid these panels because the
customer knows that we cannot come close to compete on the price of Chinese panels."); *see
also* Final Phase Hearing Tr. at 48 (testimony stating domestic producers cannot compete with
price points of Chinese hardwood plywood). It is worth noting that the POI was June 30, 2010
through June 30, 2013, after the dates specified in Clausen's testimony.

domestic products are more concentrated in the higher-end of the market is because it is the only

market segment in which they can compete with Chinese prices.  The domestic industry,

however, plaintiff insists, has the capacity to manufacture thinner products as well.

It is apparent that the ITC has supported with substantial evidence its conclusion that the

importance of price as a purchasing factor is outweighed by other purchasing factors such as

quality, availability, and end-use.  The ITC considered price as a condition of competition and

found that it was an important purchasing consideration.  Views at 27.  It also found, however,

that its importance was mitigated by other factors.  *Id.*; Final Staff Report at II-37

("Substitutability is enhanced by the fact that price was a very important factor in purchasing, but

is constrained by quality being the most important factor for more purchasers.").  The data

reflected that "[o]nly six of [forty] responding purchasers indicated price was the most important

factor."  Views at 27.

Further, the Commission found that other purchasing considerations were more

significant than price.  *Id.* at 24 ("More than two-thirds of responding importers and purchasers,

but less than one-half of U.S. producers, found that differences other than price between U.S. and

Chinese hardwood plywood were always or frequently significant.").  For example, the ITC

notes that every single purchaser ranked availability as "very important" or "somewhat

important," and twenty-three purchasers ranked availability as one of its top three purchasing

factors.  Final Staff Report at II-19 tbls. II-6 & II-7.  As to quality, thirty-three purchasers ranked

quality as among the top three purchasing considerations, and thirty-five out of forty purchasers

ranked "[q]uality exceed[ing] industry standards" as "very important" or "somewhat important."

*Id.*  In addition, "[m]ore than two-thirds of responding importers and purchasers, but less than

half of U.S. producers ([three] of [seven]), found that differences other than price between U.S. and Chinese hardwood plywood were 'always' or 'frequently significant.'" *Id.* at II-31.

The Commission's finding that price was outweighed by other purchasing decisions such as quality and availability is supported by substantial evidence.  As part of its investigation, the ITC found that "[t]he price of hardwood plywood products is a function of the panel size, face species, quality, thickness, and finish." *Id.* at I-20.  The record also reflects that the domestic product was superior in terms of other identified important purchasing considerations, namely quality (and hence end-use) and availability.  *Id.* at E-4 tbl. E-1 ("We have used both [products], have experienced significant issues with Chinese plywood, it was used in the same applications as we use domestic now.  The quality is superior and the amount of re-work is far less."); *id.* at E-4 tbl. E-1 ("Domestic quality tends to go on visible areas.  Imports tends [sic] to go in framework and box construction.").  In its evaluation of purchasing decisions, the Commission found "[q]uality was most frequently cited by purchasers as their top factor in purchasing plywood, and 33 of 40 purchasers indicated that quality was one of the three most important factors." *Id.* at II-18.  Because other factors such as quality and availability are also important considerations, and the record reflects that the domestic product was superior in quality and availability, the Commission reasonably considered the role of price in purchasing considerations and found these other factors outweighed any price factors.

Accordingly, the Commission's finding that other purchasing factors outweighed price-driven substitutability is supported by substantial evidence.

### F.      Conclusion

The court holds that the Commission's finding of moderate substitutability is supported

by substantial evidence, as it was reasonably based on survey and questionnaire responses from

importers,[17] and domestic[18] and Chinese producers,[19] evaluating both purchasing decisions and

differences in physical characteristics.  Views at 4.  The U.S. and Chinese plywood products

physically differ to a degree limiting substitutability.  Overall thickness generally differed

between U.S. plywood and Chinese products, which contributed to different end uses.  The

record also reflects that the domestic product and Chinese product's cores are composed of

different types of wood, and the manufacturing processes for each type of plywood differ

extensively.  Further, these core material manufacturing processes make the plywood more

suitable for different face veneer thicknesses, contributing to different end uses.  Moreover, the

products face veneer thicknesses significantly differ, due in part to the plywood's core material

composition.  Distinctions between face veneer thickness determine whether the plywood is

more suitable for decorative uses or laminate end uses—the major separation between the two

products.

---

[17]      U.S. import statistics were based on questionnaire responses from forty-two U.S. importers.  Views at 4.   This group of importers accounted for 70 percent of subject imports from China for the year 2012.  *Id.*

[18]      Questionnaire responses were received from eight domestic producers accounting for nearly all of U.S. production of hardwood plywood in 2012.  Views at 4.

[19]      Information about Chinese production was based on questionnaire responses from eighty-nine foreign producers, which accounted for about 52 percent of U.S. imports of hardwood plywood during 2012.  Views at 4.  It may well be that in the year prior to the POI, Chinese plywood competed more directly with the U.S. product and that, because it was cheaper and could be substituted for some uses, it displaced the U.S. product. *Id.*  During the POI, however, it is apparent that the ITC's moderate substitutability finding is supported by substantial evidence.  *Id.*

As to price, the Commission considered price as another "condition of competition," and found that while price was an important purchasing factor, other factors such as quality and availability were also important.  Plaintiff has failed to demonstrate that price is such an important purchasing factor that it outweighs the differing physical characteristics and other purchasing considerations between the domestic and Chinese plywood.  Specifically, plaintiff has failed to show that, even though the products are not exactly the same, they are similar enough to support substitutability such that price is the primary motivation among purchasers. Importantly, when, as here, there is not an apples-to-apples comparison of the two products, it is not unusual that the products should be priced differently.  Price alone, without a connection between the price and substitutability, does not establish that price differences are the reason purchasers choose Chinese plywood over U.S. plywood.

The Commission's substitutability holding is significant because the degree of overlap of domestic and Chinese products will affect the Commission's evaluation of impact in its material injury and threat of material injury determinations.  As stated, "substitutability is one factor in the evaluation of volume and price."  *R-M Indus.*, 18 CIT at 226 n.9, 848 F. Supp. at 210 n.9. Although not always the case, in some instances where two products are not directly comparable or interchangeable, there will likely be a weaker connection between the domestic and foreign products.  *See* 19 U.S.C. § 1677(7)(C)(iii)(V) ("The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.").  This lack of interchangeability surfaces in the Commission's impact analysis with respect to volume and price effects. Therefore, evaluating substitutability as a condition of competition has a direct impact on the

Commission's later considerations.  That being said, here, the Commission has supported its

limited substitutability finding with substantial evidence and it is in accordance with law.


III.   **THE COMMISSION'S MATERIAL INJURY DETERMINATION IS NOT IN ACCORDANCE WITH LAW**

To determine whether a domestic industry is materially injured or threatened by material

injury, the Commission must consider "(I) the volume of imports of the subject merchandise, (II)

the effect of imports of that merchandise on prices . . . for domestic like products, and (III) the

impact of imports of such merchandise on domestic producers of domestic like products . . . in

the context of production operations within the United States."  19 U.S.C. § 1677(7)(B)(i)(I)–

(III).  Here, the court finds that, because the Commission failed to consider properly the

magnitude of the dumping margins, its analysis of the statutory factors leading to its negative

injury determination, is unsupported by substantial evidence and is not in accordance with law.


A.   **The Commission's Significant Import Volume Finding Is Supported by Substantial Evidence**

In accordance with the statute, to evaluate the volume of subject imports, "the

Commission shall consider whether the volume of imports of the merchandise, or any increase in

that volume, either in absolute terms or relative to production or consumption in the United

States, is significant."  *Id.* § 1677(7)(C)(i).

Through its investigation, the ITC identified significant subject import volume.  Views at

29.  According to the ITC, subject imports increased from 1.4 billion square feet in 2010, to 1.5

billion square feet in 2011, and to 1.7 billion square feet in 2012.  *Id.* at 28.  The Commission

found, however, this increase in subject imports was at the expense of nonsubject imports, rather

than domestic like products, and in fact, the volume of production of domestic like products rose

during the 2010 to 2012 portion of the POI. *Id.* at 29–30 ("[W]e find the volume of subject

imports to be significant in absolute terms and relative to consumption in the United States.

However, for the reasons we discuss [in our price effects analysis], we do not find significant

adverse price effects or a significant adverse impact on the domestic industry by reason of

subject imports."). Nonsubject imports were from Brazil, Chile, Canada, Indonesia, Malaysia,

Romania, Russia, Uruguay, and Vietnam. *Id.* at 23.

Moreover, in 2010 domestic shipments totaled 565.5 million square feet, rising in 2011 to

594.7 million square feet, and again rising in 2012 to 642.2 million square feet. *Id.* at 29.

Importantly, during the POI, the market share of the domestic product rose, while the market

share of the nonsubject imports declined. *Id.* Further, the 7.1 percent decline in nonsubject

imports exceeded the Chinese products' 6 percent gain in market share. *Id.*; Final Staff Report at

IV-6 tbl. IV-3 (The nonsubject imports composed 40.8 percent of the total market share in 2010,

36.4 percent in 2011, and 33.7 percent in 2012, 36.7 percent in the 2012 interim, and 44.1

percent in the 2013 interim. The U.S. imports of subject merchandise from China composed

41.9 percent in 2010, 45.8 percent in 2011, 47.9 percent in 2012, and 44.2 percent during the

2012 interim, and 33.2 percent during the 2013 interim). At the same time U.S. market share

increased from 17.2 percent in 2010, to 17.8 percent in 2011, 18.4 percent in 2012, 19.1 percent

in the 2012 interim, and 22.7 percent in the 2013 interim. Final Staff Report at IV-6 tbl. IV-3.

Put another way, the Commission found that any gain in market share realized by the Chinese

product was a result of losses of market share by other foreign exporters.

Plaintiff agrees with the ITC that the volume of subject imports was significant, but

maintains that, despite imports from other countries possessing a substantial part of the total

market, the volume of Chinese products dominated the market over both nonsubject imports and

domestic plywood in sales.  Pl.'s Pre-Hearing Br. 26–27 ("Between 2010 and 2012 subject

import market share was not only larger than any single country source, but larger than all other

sources combined.").  Additionally, plaintiff asserts that, once the Petition was filed, the Chinese

product's market share significantly dropped, showing that the high volume of Chinese

merchandise during the POI were largely due to underselling.  *See* Pl.'s Br. 19–22.

     Here, the parties agree that import volume was significant.  As noted, Chinese plywood

imports ranged from 33.2 to 47.9 percent of the market during the POI.  Final Staff Report at IV-

6 tbl. IV-3.  Subject import volumes also increased by 0.1 and 0.2 billion square feet during the

POI.  Views at 28.  Further, the Commission found that increases in volume of Chinese plywood

during the POI were at the expense of foreign imports, not domestic plywood.  *Id.* at 29.  Based

on this information, the ITC's finding that Chinese import volume was significant within the

meaning of 19 U.S.C. § 1677(7)(C)(i) is supported by substantial evidence.


### B.    The Commission's Finding that the Significant Import Volume Did Not Significantly Depress or Suppress Prices Is Supported by Substantial Evidence

     As to price effects, the statute requires the Commission to consider whether—

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

     The ITC concluded that there was significant price underselling of Chinese plywood, but

that this underselling did not depress or suppress prices to a significant degree.  Views at 30–33.

The Commission found that the lack of price effects could be explained, at least in part, by the goods not being directly substitutable. *Id.* at 33 n.123 (The ITC also "note[d] the lack of price effects, despite significant subject import volume and underselling, may be due in some degree to differences in product characteristics between domestic product and subject imports.").[20] In determining the price effects of subject imports, the Commission's finding was influenced by its conclusion that non-price differences, such as quality, availability, veneer thickness, and core quality, explained why the significant volume of Chinese imports failed to have a significant price effect. *See id.* at 30.

As to underselling, the Commission found there was "significant price underselling by the imported merchandise as compared with the price of the domestic like product." *See* 19 U.S.C. § 1677(7)(C)(ii); *see also* Views at 30 ("Subject imports undersold the domestic like product in 83 of the 84 price comparisons, with margins of underselling ranging from 0.9 to 56.5 percent."). Because of the prevalence of underselling and large margins of many of the sales, the Commission concluded that underselling was "significant" within the meaning of the statute. *Id.* at 30–31.

Thus, while the ITC found significant underselling, it did not find an adverse effect on prices of domestically-manufactured hardwood plywood. *See id.* The Commission based this conclusion on pricing data for six products,[21] which "differed in characteristics such as panel

---

[20]     As discussed previously, the Commission found, "[a]lthough price is an important factor in purchasing decisions, quality and availability are other top factors," and "[o]nly six of [forty] responding purchasers indicated that price was the most important factor." Views at 27. Again, as noted, the Commission found that purchasing decisions between the two products largely hinged on end use.

[21]     Notably, plaintiff selected five of the six products on which the ITC based these conclusions. Views at 30 n.106.

thickness, wood species, and grade," and "accounted for [7] percent of U.S. producers' shipments of hardwood plywood and 16 percent of U.S. shipments of subject imports from January 2010 through June 2013."[22]  *Id.* at 30 n.106.  Based on this pricing data, the ITC concluded there was no "significant correlation between subject import prices and the domestic industry's prices or shipment volumes," because "[p]rices for the subject imports trended upward throughout the [POI] for all six of the products," as well as "for most domestically produced products."  *Id.* at 31 (citing Final Staff Report at V-6–V-11 tbls. V-3–V-8).  Thus, because three of six products showed an increase in domestic price during the POI, and one was approximately the same throughout the POI, the Commission concluded that prices had not "been depressed to a significant degree by subject imports."  *Id.* at 32.  In other words, despite subject import's underselling of the domestic like product, the ITC concluded the data indicated that domestic producers were not required to decrease prices or unable to increase prices.

Moreover, the Commission found no domestic price suppression as a result of subject imports because "[t]he domestic industry's [cost of goods sold ('COGS')]/net sales ratio was generally flat throughout most of the [POI]."  *Id.* at 33.  The cost of goods sold is the "price of buying or making an item that is sold"; generally in the manufacturing context, this "includes direct material, direct labor, and factory overhead associated with producing it."  Joel G. Siegel

---

22      The ITC's findings with respect to the six products indicated that:

Domestic prices increased from January–March 2010 to April–June 2013 for pricing products 1, 3, and 4 by 3.0 percent, 11.9 percent, and [[      ]] percent, respectively.  The price for product 2 [[                    ]] in April–June 2013 as in January–March 2010 (it was 1.2 percent lower).  For product 5, the price fluctuated, ending 4.0 percent lower in April–June 2013 compared to January– March 2010.  The price for product 6 fluctuated as well, ending 16.4 percent lower in April–June 2013 compared to January–March 2010.

Views at 31 (citing Final Staff Report at V-6–V-11 tbls. V-3–V-8).

& Jae K. Shim, Dictionary of Accounting Terms 101 (2d ed. 1995).  Net sales are the "gross

sales less sales returns and allowances and sale discounts."  *Id.* at 273.  Here, this ratio was

determined by evaluating operations of U.S. producers, by firm, during the years 2010 through

2012.  Final Staff Report at VI-6 tbl. VI-2.  Here, the COGS/net sales ratio "was 90.1 percent in

2010, 90.6 percent in 2011 and 90.7 percent in 2012.  It was 90.6 percent in interim 2012 and

88.8 percent in interim 2013."  Views at 33.  Put another way, "[t]hese data tell the story, and the

Commission reasonably found that the domestic industry was able to raise prices consistent with

rising production costs, and the significant volume of lower-priced subject imports did not have

significant price-suppressing effects."  Def.'s Br. 26 (citation omitted).

Relatedly, during the POI, the Commission found that there was no evidence of a shift in

volume from the domestic industry to the subject imports or a loss of market share.  Views at 32.

Indeed, "[t]he market share of the domestic like product rose steadily from 17.2 percent in 2010

to 17.8 percent in 2011 and 18.4 percent in 2012; it was 19.1 percent in interim 2012 and 22.7

percent in interim 2013."  *Id.* at 29.  As to profits, although "[t]he industry's operating margin

was low throughout the [POI]," the ITC found it "declined only slightly," and thus there was no

"significant negative correlation between subject imports and the industry's condition, much less

a causal relationship."  *Id.* at 36.  The Commission's conclusion that "underselling did not cause

a shift in volume from the domestic like product to the subject imports"[23] during the POI was

---

[23]     In further support that underselling did not cause a shift in volume, the
Commission also surveyed U.S. purchasers who reported switching from buying domestic
plywood to the imported product in 2009 because the Chinese product's physical characteristics
were more suitable to their end uses.  Final Staff Report at V-25 tbl. V-12 ("The U.S. produced
material is a higher face veneer thickness than is required for our application and is thus
overpriced."); *id.* at V-24 tbl. V-12 ("[W]e [p]urchase what our customers want to buy.  Some
want domestic, some want imports.").

based on data showing "quarterly shipments of domestically produced hardwood plywood were

greater in 2012 when total subject import volume was at its peak, than in 2010."[24] *Id.* at 32.

Thus, the Commission concluded that during the POI, there was no indication that subject

imports had an impact on the price or volume of the domestic product because both products'

market shares and prices increased at the same time.

In preparing its Final Staff Report, the Commission asked U.S. plywood producers to

report lost sales or revenue since January 1, 2009.[25]  Final Staff Report at V-21.  In response to

the ITC's requests surveying purchasers from 2009 through 2011, "[f]ive out of the eight

responding U.S. producers reported that they had to reduce prices, but only one . . . reported

having to roll back announced price increases."  *Id.*  As part of this inquiry, three of the five

purchasers who shifted to Chinese plywood in 2009 stated they began purchasing Chinese

plywood because of price.  *Id.* at V-22.  The Commission concluded, however, that despite lost

sales since 2009, before the POI, these "[lost sales] do[] not outweigh other data in the record

showing the lack of significant price effects" during the POI.  Views at 33.

---

[24]     The tables reflect the weighted average of prices and quantities of the six
domestic and imported products, and show that the volume of both domestic and Chinese
products increased at the same time.  *See* Final Staff Report at V-6–V-11 tbls. V-3–V-8.  For
example, in 2012 for Product 1, the domestic product's volume was at its highest at the same
time the Chinese product's volume was at its highest; specifically, in 2012 domestic producers'
annual volume was 8,827,000 square feet compared to 2010, when domestic producers' volume
was only 5,034,000 square feet.  Similarly, the subject imports volume in 2012 was 45,529,000
square feet and in 2010, the annual subject import volume was 33,828,000 square feet.  *See* Final
Staff Report at V-6 tbl. V-3.  Further, even though the domestic producers increased Product 4's
prices, sales of the product remained constant.  Views at 31–32 n.114.

[25]     Three producers alleged specific lost sales, which involved nine purchasers.  Final
Staff Report at V-21.  These lost sales allegations amounted to $44.6 million, but only five of
these allegations were verified by the Commission.  *See id.*  Further, "no firm reported lost
revenue allegations."  *Id.*

As for plaintiff, it claims there was evidence before the Commission indicating subject imports had an adverse effect on prices of domestically manufactured hardwood plywood.[26]  *See* Pl.'s Br. 18.  Although the parties agree that there was significant underselling, plaintiff emphasizes that "[a]ll five responding purchasers 'reported that they had shifted purchases of hardwood plywood from U.S. producers to subject imports since 2009; three of these purchasers reported that price was the reason for the shift.'"  Pl.'s Br. 18 (quoting Final Staff Report at V-22).[27]  The Coalition argues that "[d]omestic producers reported a combination of lost sales and instances where they had to reduce prices in response to import competition," amounting to "nearly $45 million and involved 36 million square feet of hardwood plywood."[28]  Pl.'s Pre-Hearing Br. 37.  For plaintiff, the underselling caused purchasers to shift from domestic plywood to Chinese plywood, and had significant price effects on the domestic industry.

Relatedly, where the ITC found steady margins and profits, the Coalition sees stagnation.  That is, because "*all* subject imports were found to be unfairly traded,"[29] "the domestic industry's operating margin remained at anemic levels throughout [the POI], rising only when

---

[26]     In support of its argument regarding adverse price effects, plaintiff points to Clausen's testimony.  Pl.'s Br. 18–19 (citing Clausen Testimony at 157–58) ("That market today is almost entirely owned by the Chinese market. . . .  [T]hat market is almost totally gone for the domestic manufacturer because of price, and it's the same product.  It's exactly the same product.").

[27]     Plaintiff "detailed a lengthy series of responses to the Commission's Purchasers' questionnaire, which clearly reflect the fundamental importance of price in purchasing decisions."  Pl.'s Br. 18 (citing Pl.'s Pre-Hearing Br. 20–23).

[28]     Plaintiff also asserts that "[s]taff reported that all responding purchasers reported that they had shifted purchasers of hardwood plywood from U.S. producers to subject imports since 2009, with price reported as the reason for the shift by the majority of those purchasers."  Pl.'s Pre-Hearing Br. 37.

[29]     By "unfairly traded," it appears plaintiff means that Commerce had found the goods were sold at less than fair value and were subsidized.  *See* Pl.'s Br. 18.

subject imports strongly abated after the filing of the [P]etition." Pl.'s Br. 18. For plaintiff, the

effect of the underselling is further shown by Commerce's September 2013 determination that

Chinese plywood was being sold at less than fair value, and its selection of dumping margins for

Chinese imports ranging from 55.76 to 121.65 percent. *Final Determination*, 78 Fed. Reg. at

58,276–82. In other words, plaintiff argues that, due to the low cost at which subject imports

were sold in the United States, the domestic industry's operating margins were forced to remain

low during the POI, and rose only after preliminary duties were imposed at the beginning of the

ITC's investigation. *See* Pl.'s Br. 18. Viewing the facts from this perspective, plaintiff argues

that the ITC's finding of no adverse price effects by reason of subject imports is not supported by

substantial evidence. *Id.*

Plaintiff also points to the effects on price after the Petition was filed. Pl.'s Br. 22 ("The

tangible, beneficial effects of the Petition were also apparent in increased domestic industry

prices."). After the Petition was filed, and as part of its investigation, the Commission looked at

subject import volumes during the POI spanning the years 2010 through the 2013 interim. *Id.*

The Commission found that prior to the filing of the Petition, which could potentially lead to the

imposition of duties on Chinese plywood, the subject imports from China were growing

significantly, by 21.5 percent during the years 2010 to 2012. Pl.'s Pre-Hearing Br. 26–27.

Plaintiff insists it is meaningful that, despite all market indicators for plywood showing upward

trends, after the Petition was filed, "subject import volume dropped by 29 percent between [the]

first half of 2012 and [the] first half of 2013." Pl.'s Pre-Hearing Br. 27. Plaintiff presumes, in

the context of a market generally, the filing of a petition indicates to importers the potential for

imposition of duties on the merchandise, leading to an increase in the cost of the product

importers hope to sell in the United States. For plaintiff, the importers' reaction to the filing of

the Petition highlights their sensitivity to price and further supports the Coalition's assertion

"that purchasing decisions are largely based on price."  Pl.'s Br. 19.  Put another way, because

the subject imports were being sold, at least in some cases, at materially lower prices than the

domestic like product, when importers learned that the Chinese product might end up being more

expensive, they stopped importing it, demonstrating the choice between products was largely

dependent on price.  *See* Pl.'s Br. 18, 22–23.  Moreover, after the Petition was filed, prices

increased.[30]  Pl.'s Br. 22–23 ("[A]verage unit net sales value increased from $1.14 to $1.16 per

square foot between interim 2012 and 2013 [(i.e., after the Petition was filed)].  This may seem

like a small improvement, but given that domestic producers' unit cost of goods sold remained

flat at $1.03 between the interim periods, these increased prices flowed through directly to the

domestic industry bottom line, leading to improved operating income.").[31]

  The court finds the Commission's conclusion that the effects of imports did not

significantly depress or suppress prices is supported by substantial evidence.  *See* Views at 33;

*see also* 19 U.S.C. § 1677(7)(C)(ii).  The Commission reached its conclusion based on pricing

---

[30]  During the administrative proceedings, plaintiff asserted:

> Domestic prices generally rose in the early half of 2013, but subject import prices rose even faster, thereby increasing the incentive for purchasers to buy domestic rather than importing from China.  The U.S. market share rose, the Chinese market share fell.  Gross profit and average operating income per unit experienced by domestic producers consequently rose sharply in 2013 as this case proceeded.  The drop in the domestic industry's COGS to sales ratio from 90.6 percent to 88.8 percent between the partial-year periods, after being flat between 2010 and 2012, is strong evidence that domestic prices were suppressed by subject imports prior to the filing of the Petition.

Pl.'s Pre-Hearing Br. 38.

[31]  During the 2013 interim, "[o]perating income increased by 142 percent."  Pl.'s Br. 23.

data from six products, half of which experienced an upward trend in domestic prices during the

POI, and the remainder of which stayed approximately the same or decreased only slightly.  *See*

Views at 31; *see also* Final Staff Report at V-6–V-11 tbls. V-3–V-8.  In addition, there was no

shift in volume from domestically-produced hardwood plywood to subject imports, there was no

loss in market share for the domestic industry, and the COGS/net sales ratio for the domestic

industry did not fluctuate materially during the POI.  *See* Views at 32–33.  In fact, the record

indicates that during the POI "quarterly shipments of domestically produced hardwood plywood

were greater in 2012 when total subject import volume was at its peak, than in 2010," and "[t]o

the extent that subject imports gained market share, they did so at the expense of nonsubject

imports and without depressing domestic prices."  Views at 32–33.  Therefore, it was reasonable

for the ITC to conclude subject imports caused no adverse price effects on the domestic like

product because domestic prices experienced an upward trend during the POI.  Financial

indicators, such as volume, market share, and profit margins of the domestic industry, do not

support a contrary conclusion.

Even were the court to credit some of plaintiff's claims, its holding that the ITC's

findings were supported by substantial evidence would not change.  As to plaintiff's claim that

purchasers shifted their purchases of hardwood plywood from U.S. producers to subject imports,

the court finds this does not appear to have adversely affected the price of domestically-

manufactured hardwood plywood.  Despite confirmed lost sales since 2009, the Commission

reasonably concluded "this factor does not outweigh other data in the record showing the lack of

significant price effects."  *See* Views at 33; *see also GEO Specialty Chems., Inc. v. United States*,

33 CIT 125, 132–33, Slip Op. 09-13, at 5 (2009) ("'[L]ost sales alone do not mandate an

affirmative finding of injury; rather the Commission must determine whether lost sales, together

with other factors, indicate a causal nexus between the imports at less than fair value and

material injury to the domestic industry.'" (quoting *Maverick Tube Corp. v. United States*, 12

CIT 444, 449, 687 F. Supp. 1569, 1575 (1988))).  As noted, prices for domestic plywood

remained steady during the POI, and for three products prices actually increased, while Chinese

prices also increased.  Moreover, the volume of domestic shipments, both as a percentage of the

market share and in absolute terms, actually increased.  Thus, even crediting the evidence of lost

sales, the Commission's conclusion that the pricing of the subject merchandise did not adversely

affect the domestic industry's prices is supported by substantial evidence.

Finally, the court finds the Commission reasonably concluded that the filing of the

Petition did not fully explain the domestic price increases.  *See* Views at 36 ("We note that some

indicators improved in interim 2013 after the [P]etition[ ] [was] filed.  However, the domestic

industry's . . . prices were improving before the [P]etition[ ] [was] filed and before preliminary

duties were imposed.").  As will be discussed, after evaluating the other statutory factors, the

Commission concluded the filing of the Petition could not explain the domestic industry's

improvement because "while the Petition[ ] may have had some beneficial effect on the industry,

we do not find that the pendency of these investigations fully explains the improvement in the

industry's condition in interim 2013."  *Id.* at 36.  This conclusion, based solely on the effect of

the filing of the Petition, was reasonable because prices were increasing prior to the filing of the

Petition, and because there was an overall lack of correlation between the significant volume of

Chinese imports and the price effects on the domestic product.

In sum, the court finds the Commission's conclusion that, although the volume of subject

imports was significant, there were no significant adverse price effects on the domestic like

product caused by the subject imports, is supported by substantial evidence.

**C.     The Commission's Finding That There Was No Adverse Impact on the Domestic Industry by Reason of Subject Imports Is Not in Accordance with Law**

As part of its material injury determination, the Commission must also consider "the impact of imports of such merchandise on domestic producers of domestic like products . . . in the context of production operations within the United States."  19 U.S.C. § 1677(7)(B)(i)(III). In doing so,

> the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—
>
>     (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
>
>     (II) factors affecting domestic prices,
>
>     (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
>
>     (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
>
>     (V) in [antidumping proceedings], the *magnitude of the margin of dumping*.

*Id.* § 1677(7)(C)(iii) (emphasis added).  The statute "propounds a non-exhaustive list of 'relevant economic factors' the ITC must consider in its impact analysis," and these factors must be weighed "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  *Hynix Semiconductor*, 30 CIT at 1221, 431 F. Supp. 2d at 1315; 19 U.S.C. § 1677(7)(C)(iii).  In its Final Determinations, the Commission found "the subject imports ha[d] not had a significant impact on the domestic industry" primarily based on economic indicators that improved during the POI.  *See* Views at 36.

As to the first factor, "actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity," the Commission found: "[t]he

domestic industry's U.S. shipments increased steadily from 2010 to 2012 and were higher in

interim 2013 than in interim 2012"; "domestic producers' production increased steadily

throughout the [POI] as well"; capacity utilization was steady throughout the POI, despite a

decrease during interim 2013; and productivity improved. *Id.* at 34–35. The Commission also

found, however, that "the industry's financial indicators were somewhat less positive," because

the domestic industry's operating income and operating income margin declined during 2011 and

2012. *Id.* at 35.

Next, the Commission must consider "factors affecting domestic prices." As noted in its

price effects findings, the Commission did not find that subject imports had suppressed domestic

prices to a significant degree. *See* Views at 33. The Commission must also consider "actual and

potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise

capital, and investment." *Id.* § 1677(7)(C)(iii). As to these considerations, the ITC found that

"the number of production and related workers rose steadily from 2010 to 2012, and there were

more workers in interim 2013 than in interim 2012"; that there was an increase in wages paid;

and that "[m]ost of the industry's trade and employment indicators improved during the [POI],

including in interim 2013 as the industry continued to recover from the recession." *Id.* at 34–35.

Some indicators, however, went the other way. For instance, the Commission found that the

industry's "operating income margin declined from 2010 to 2012." *Id.* at 35, 35 n.136.

Another factor to be considered is the "actual and potential negative effects on the

existing development and production efforts of the domestic industry, including efforts to

develop a derivative or more advanced version of the domestic like product." 19 U.S.C.

§ 1677(7)(C)(iii)(IV).  As to this factor, the Commission found that U.S. research and

development expenses only slightly declined.[32]  Views at 35 n.138.

The Commission, however, gave short shrift to the last statutory factor, "the magnitude of

the margin of dumping," by addressing it only in a footnote, merely noting "Commerce found

antidumping duty margins ranging from 55.76 percent to 121.65 percent for imports of

hardwood plywood from China" in its less-than-fair-value determination.  *Id.* at 33 n.124.

In the end the ITC concluded, based on this information, that "despite a significant

volume of subject imports and significant underselling," the U.S. plywood industry grew during

the POI, and therefore, it did "not find that the record shows a significant negative correlation

between subject imports and the industry's condition, much less a causal relationship."  *Id.* at

35–36.

For the reasons stated above, the court finds the Commission's determinations as to

volume and price effects are supported by substantial evidence and in accordance with law.

Furthermore, with the exception of the previously-noted failure of the ITC to consider seriously

the magnitude of the dumping margins, the Commission's remaining impact findings are

supported by substantial evidence and are in accordance with law.  As with its conclusions

relating to volume and price effects, the ITC's finding of no adverse impact was based on data

showing that financial and employment indicators improved during the POI.  Although some

financial indicators were less positive for the domestic industry, as a whole, the industry's

financial position was improving.  For instance, the volume of "U.S. shipments rose from 565.5

million square feet in 2010 to 594.7 million square feet in 2011 and 642.2 million square feet in

---

[32]      U.S. research and development expenses declined from [[      ]] in 2010 to [[
]] in 2011 and 2012.  Views at 35 n.138.  During the interim periods, research and development
expenses fell from [[      ]] to [[      ]].  *Id.*

2012.  They were 323.8 million square feet in interim 2012 and 366.2 million square feet in

interim 2013."  *Id.* at 34 n.126.  In addition, U.S. production[33] and capacity utilization[34]

increased, the number of workers and the hours worked increased,[35] as did wages[36] and

productivity.[37]  Additionally, net income increased at the beginning of the POI, although it

declined at the end of the period.[38]  While the operating income margin declined from 2010 to

2012,[39] it only declined slightly and then increased between interims 2012 and 2013.  Despite

---

[33]      "Production increased from 587.7 million square feet in 2010 to 619.8 million square feet in 2011 and 669.3 million square feet in 2012.  It was 338.1 million square feet in interim 2012 and 383.3 million square feet in interim 2013."  Views at 34 n.127.

[34]      "Capacity utilization [rose] from 44.3 percent in 2010 to 46.7 percent in 2011 and 51.1 percent in 2012.  It was 51.4 percent in interim 2012 and 59.4 percent in interim 2013."  Views at 34 n.128.

[35]      "The number of production and related workers increased from 1,753 in 2010 to 1,799 in 2011 and 1,868 in 2012.  It was 1,829 in interim 2012 and 1,944 in interim 2013."  Views at 35 n.130.  In addition, the "[h]ours worked climbed from 3.8 million hours in 2010 to 3.9 million hours in 2011 and 4.1 [million] hours in 2012.  They totaled 2.1 million hours in interim 2012 and 2.2 million hours in interim 2013."  *Id.* at 35 n.131.

[36]      "Wages paid rose from $65.1 million in 2010 to $66.2 million in 2011 and $72.2 million in 2012.  They totaled $35.6 million in interim 2012 and $39.0 million in interim 2013."  Views at 35 n.132.

[37]      "Productivity increased from 156.0 square feet per hour in 2010 to 157.4 square feet per hour in 2011, then to 163.2 square feet per hour in 2012.  It was 162.1 square feet per hour in interim 2012 and 174.1 square feet per hour in interim 2013."  Views at 35 n.133.

[38]      "Net income rose from $5.4 million in 2010 to $8.3 million in 2011 and fell to $6.9 million in 2012.  It totaled $5.7 million in interim 2012 and $17.6 million in interim 2013."  Views at 35 n.135.

[39]      "Operating income declined from $12.5 million in 2010 to $10.4 million in 2011 and increased to $11.0 million in 2012.  It was $8.2 million in interim 2012 and $19.8 million in interim 2013."  Views at 35 n.134.  "The operating income margin was 2.1 percent in 2010 and 1.6 percent in 2011 and 2012.  It was 2.3 percent in interim 2012 and 4.8 percent in interim 2013."  *Id.* at 35 n.136.

U.S. research and development expenses decreasing, indicating a downward trend in innovation

investment,[40] capital expenditures increased[41]  showing domestic industry growth.

The court finds unconvincing plaintiff's argument that the post-petition improvements in

the domestic industry are evidence that underselling of subject imports had an adverse impact on

the domestic industry in its production operations.  Financial and employment indicators were

steadily improving prior to the filing of the Petition, and therefore it was reasonable for the

Commission to conclude that post-petition improvements in the domestic industry were not

attributable to the filing of the Petition or imposition of preliminary duties.  The Commission

collected and evaluated the industry's pre- and post-Petition data, reflecting that the domestic

industry's financial indicators showed improvement even before the Petition was filed.  *See*

Views at 36 ("Thus, while the [P]etition[ ] may have had some beneficial effect on the industry,

we do not find the pendency of these investigations fully explains the improvement in the

industry's condition . . . or supports a conclusion that subject imports were having an injurious

impact on the domestic industry prior to the filing of the [P]etition[ ].").  Despite plaintiff's

reliance on post-Petition improvements in the domestic industry for its assertion that subject

imports had a significant adverse impact during the POI, the Commission reasonably concluded

that any post-Petition improvements in the domestic industry were a continuation of an upward

trend, rather than a result of the filing of the Petition or the imposition of preliminary duties.

---

[40]      "Research and development expenses fell from [[        ]] in 2010 to [[        ]] in
2011 and 2012.  They totaled [[        ]] in interim 2012 and [[        ]] in interim 2013."  Views at
35 n.138.

[41]      "Capital expenditures increased from $4.1 million in 2010 to $7.3 million in 2011
and $7.4 million in 2012.  They totaled $2.7 million in interim 2012 and $8.8 million in interim
2013."  Views at 35 n.137.

Moreover, it is worth noting the role the statute provides for post-petition data.

Specifically, 19 U.S.C. § 1677(7)(I) provides, in relevant part:

> The Commission shall consider whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation . . . is related to the pendency of the investigation and, if so, the Commission *may reduce the weight* accorded to the data for the period after the filing of the petition in making its determination.

19 U.S.C. § 1677(7)(I) (emphasis added).  Thus, while plaintiff suggests the Commission should increase the weight it accorded to the post-Petition data, the statute provides the opposite: the Commission "may reduce the weight" it accords to post-petition data.  *See id.*; *see also Nucor Corp. v. United States*, 414 F.3d 1331, 1341 (Fed. Cir. 2005); *JMC Steel Grp. v. United States*, 38 CIT __, __, 24 F. Supp. 3d 1290, 1313 (2014) ("The statute gives the Commission ample discretion to decide whether to discount evidence due to petition-induced volume changes.  In this case, the agency provided a reasonable explanation for its decision not to discount the interim 2012 data.").

When it comes to the final mandated factor to be considered, however, the Commission's findings are not in accordance with law.  In making its material injury determination, the Commission is directed to consider the "impact of imports . . . on domestic producers of domestic like products" by evaluating "all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to . . . [in a dumping proceeding], the magnitude of the margin of dumping."  19 U.S.C. § 1677(7)(C)(iii).  The Coalition argues, that pursuant to the statute, the ITC is required to "consider" the "magnitude of the [dumping margins]," and that the mere recitation of the dumping margins in a footnote does not amount to sufficient consideration under the statute.  *See* Pl.'s Br. 24–25.

Specifically, the Coalition contends "the ITC's 'consideration' of this statutory factor amounted to no more than a simple recitation of the final dumping margins, relegated to only a footnote in the Views." Pl.'s Br. 8–9. The dumping margins are significant for plaintiff because they "speak directly and consequently to the pronounced price advantage evidence by subject imports." Pl.'s. Br. 26; *see also* Pl.'s Br. 9 ("This analytical omission was particularly significant since . . . subject imports account for the largest supply source for the subject merchandise in the U.S. market during the [POI], and [coincides] with the substantial margins of underselling found by the Commission.").

According to plaintiff, while the ITC may have in fact considered the dumping margins, there is no way to evaluate whether and how they affected the Commission's Final Determinations since no explanation was provided. *See* Pl.'s Br. 25. In support of its position, the Coalition cites *Altx, Inc. v. United States*, for the proposition that the ITC "must address evidence that 'seriously undermines its reasoning and conclusions.'" Pl.'s Br. 26 (quoting *Altx, Inc. v. United States* (*Altx I*), 25 CIT 1100, 1117–18, 167 F. Supp. 2d 1353, 1374 (2001)). To plaintiff, the dumping margins are significant and "constitute a direct barrier against the domestic industry's ability to compete for sales in a fair and open market." Pl.'s Br. 26. Therefore, according to the Coalition, because the Commission failed to evaluate adequately the dumping margins in its Views, its determination is not supported by substantial evidence and is not in accordance with law. *See* Pl.'s Br. 26–27.

The "dumping margin" is the difference between normal value (home market price) and export price (U.S. price). 19 U.S.C. § 1677(35)(A). While the magnitude of the margin is important for Commerce when it is determining an antidumping duty rate, in recent years it has not been seriously considered by the ITC when making injury determinations. *See Consol.*

*Fibers, Inc. v. United States*, 32 CIT 855, 862–63, 574 F. Supp. 2d 1371, 1379–80 (2008);

*Asociacion de Productores de Salmon y Trucha de Chile AG v. U.S. Int'l Trade Comm'n*, 26 CIT

29, 44–45, 180 F. Supp. 2d 1360, 1376 (2002); *Comm. of Domestic Steel Wire Rope & Specialty*

*Cable Mfrs. v. United States*, 26 CIT 403, 418–20, 201 F. Supp. 2d 1287, 1302–04 (2002)

(finding that the Commission's underlying use of the COMPAS model,[42] when evaluating the

data, constitutes consideration under the statute).  Indeed, since the Commission abandoned its

use of the COMPAS model, it appears to have concluded dumping margins are no longer

relevant to an injury determination.  This may be because, in an underselling inquiry, the ITC

looks at the amount that the foreign product undersells the domestic product in the U.S. market,

not the difference in sales price of the foreign product in its home market and its price in the

United States.

    Even so, this Court has cautioned that "explicit discussion of the rol[e] of the dumping

margin in injury determinations would better serve the statute," and in the absence of such a

discussion, whether the Commission considered the magnitude of the dumping margins depends

on the facts and circumstances of a specific case.  *See Comm. of Domestic Steel Wire Rope*, 26

CIT at 421 n.12, 201 F. Supp. 2d at 1304 n.12.  The Federal Circuit has characterized the

material injury statutory factors, including the magnitude of the dumping margins, as a

---

[42]     The Commercial Policy Analysis System (the "COMPAS" model), which is no
longer used by the Commission, is an economic model that examines "the health of the domestic
industry."  *Altx, Inc. v. United States (Altx III)*, 370 F.3d 1108, 1112 (Fed. Cir. 2004); *see id.* at
1122 n.11 ("The COMPAS model incorporates the dumping margin as part of its analysis.  The
operation of the model is such that a high dumping margin can control the outcome, outweighing
the value contributed by other variables.").  The use of the COMPAS methodology indicated that
the Commission had evaluated the magnitude of the dumping margins because the COMPAS
model relied upon "dumping margins[ ] to measure the economic effects of the subject imports
on the domestic industry."  *Comm. of Domestic Steel Wire Rope*, 26 CIT at 419, 201 F. Supp. 2d
at 1302.

"Congressionally mandated 'minimum analysis,' which must be undertaken." *Trent Tube Div.,*

*Crucible Materials Corp. v. United States*, 975 F.2d 807, 814 (Fed. Cir. 1992) ("[Section

1677(7)(C)(iii)] list[s] factors which the Commission 'shall,' not may, consider and evaluate in

determining the effect on the domestic industry.  Depending on the circumstances, the

Commission may not need or be able to consider each listed factor; it may also consider other

relevant factors, such as the intent of the importer or the effect on competition.  However, the

Commission cannot ignore or bypass the core factors directed by the statute.").

The Commission insists that it gave the magnitude of the dumping margins adequate

consideration.  The ITC relies upon *Altx II*, as affirmed by the Federal Circuit in *Altx III*, to

support its contention that mentioning the dumping margins in a footnote constitutes sufficient

consideration under the statute.  Def.'s Br. 35 ("The Court stated in [*Altx II*] that 'while the ITC

has a statutory obligation to consider the dumping margin, it has little significance if there is no

connection between the pricing of the foreign product and the condition of the domestic

industry.'" (quoting *Altx, Inc. v. United States* (*Altx II*), 26 CIT 1425, 1432, Slip Op. 02-154, at 6

(2002), *aff'd*, *Altx, Inc. v. United States* (*Altx III*), 370 F.3d 1108 (Fed. Cir. 2004)).  To

defendant, because the *Altx II* Court noted that under the facts of that case, the dumping margins

"ha[d] little significance" because the Commission had found "no adverse price effects or impact

by reason of subject imports," it is necessarily true in the present case that "the dumping margins

were of little consequence."  Def.'s Br. 35 (citing *Altx II*, 26 CIT at 1432, Slip Op. 02-154, at 6).

In other words, defendant insists that, because the Commission concluded there was no adverse

impact as a result of subject imports, based on its conclusion that despite significant subject

import volume there was no sign of significant adverse price effects, the Commission's mention

of Commerce's dumping margins was all that the law required.

The Commission, however, has misread these opinions.  The facts of the *Altx* cases show:

(1) the dumping margins for the steel products at issue were assigned using adverse facts

available ("AFA")[43] because the respondents failed to answer the questionnaires, and (2) the ITC

explicitly noted that the high margins resulting from the application of AFA skewed the results

when used in conjunction with the COMPAS model.  *See Altx II*, 26 CIT at 1432–33, Slip Op.

02-154, at 6–7; *Altx III*, 370 F.3d at 1122–23 n.11.  Thus, the Commission's determination in

*Altx* explicitly considered the magnitude of the dumping margins.  *See Altx III*, 370 F.3d at 1123

("Here, the Commission fully complied with its statutory duty by at least 'consider[ing] . . . the

magnitude of the margin of dumping.'").  These cases do not stand for the proposition that the

Commission may satisfy the statute, in every instance, by noting the magnitude of the margins in

a footnote.  Rather, they hold that the importance of the magnitude of the margins can be

enhanced or discounted based upon the specific facts, but in all cases, the role of the magnitude

of the margins must be evaluated.

Congress added the consideration of "the magnitude of the dumping margins" in the

impact portion of the Commission's injury determinations in 1994.  While the addition of the

magnitude of the dumping margin was new to the statute in 1994, it was not new to the law.

Indeed, use of dumping margins in injury determinations has quite a history.[44]  First, dumping

---

43      "If Commerce finds that a respondent has 'failed to cooperate by not acting to the best of its ability to comply with a request for information,' the statute permits the agency to draw adverse inferences commonly known as 'adverse facts available' when selecting from among the available facts."  *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338 (Fed. Cir. 2016) (quoting 19 U.S.C. § 1677e(b) (2006)).

44      Congress added the directive to the ITC to evaluate "the magnitude of the margin of dumping" in its impact determinations when it enacted the Uruguay Round Agreements Act ("the Act").  Uruguay Round Agreements Act, Pub. L. No. 103-465, § 222(b)(1)(B), 108 Stat. 4809, 4870 (1994) (codified as 19 U.S.C. § 3501 et seq.).  The ITC's consideration of dumping margins, however, was a feature of the law before its explicit addition to the statute.  As early as

1921 and continuing until 1979, the ITC (and its predecessor the Tariff Commission) regularly, if not consistently, used dumping margins when making injury determinations. The use of dumping margins varied from investigation to investigation and review to review, but the ITC, in making injury determinations, took the magnitude of the dumping margins into account in many proceedings. N. David Palmeter, *Countervailing Subsidized Imports: The International Trade Commission Goes Astray*, 2 Pac. Basin L.J. 1, 6–9 (1983).

In 1979, Congress enacted the Trade Agreements Act of 1979. As noted in the Ways and Means Committee Report, the 1979 Act was designed to "implement multilateral trade negotiations which were anticipated internationally with the signing of the Tokyo Declaration in September 1973." H.R. Rep. No. 103-826, at 66–67 (1994). Although the 1979 Act did not mention the use of dumping margins in injury determinations, it did mark a change in their use by the Commission. Specifically, following the 1979 Act, the ITC began to move away from using dumping margins in injury determinations. *Cf. Copperweld Corp. v. United States*, 12 CIT 148, 154–59, 682 F. Supp. 552, 560–64 (1988); *Hyundai Pipe Co. v. U.S. Int'l Trade Comm'n*, 11 CIT 117, 121–23, 670 F. Supp. 357, 360–62 (1987). Indeed, a majority of Commissioners seem to have abandoned the practice by 1984. As to the use of dumping margins in injury determinations, when the provision was added to the law in 1994, the Report of the Committee on Ways and Means states:

> *Present law*
>
> Under current law, the Commission is neither required to nor prevented from considering the margin of dumping in its analysis of material injury by reason of imports. *See Copperweld Corp v. United States*, 682 F. Supp. 552, 564 (Ct. Int'l Trade 1988).
>
> *Explanation of provision*
>
> Section 222(b)(1)(B) of H.R. 5110 amends section 771(7)(C)(iii) [(19 U.S.C § 1677(7)(C)(iii))] of the Act by adding the magnitude of the margin of dumping to the list of factors the Commission considers in determining the impact of imports of subject merchandise on domestic producers of like products.
>
> *Reason for change*
>
> The amendment is necessary to conform U.S. law to the [Uruguay Round] Agreement.

H.R. Rep. No. 103-826, at 66–67 (1994). Moreover, the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA") gives some direction as to how the ITC's evaluation is to be conducted:

> [T]he Antidumping Agreement requires the consideration of the magnitude of the dumping margin in determining whether there is material injury by reason of the dumped imports. In preliminary injury determinations, where Commerce has not

margins were frequently considered, despite a lack of a statutory requirement.  *Copperweld*

*Corp. v. United States*, 12 CIT 148, 154–59, 682 F. Supp. 552, 560–64 (1988).  Second, there

was a gradual move by the Commissioners to abandon the practice of considering dumping

margins.  And third, Congress added the provision requiring the Commission to consider the

magnitude of the dumping margins in its material injury determinations.  The addition of this

requirement after the practice had been abandoned, moreover, serves to underscore the

mandatory nature of Congress's action.  Here, the Commission's consideration of this factor

amounts to nothing more than the recitation of the dumping margins found by Commerce in a

footnote.  Taking into account the long history of the use of dumping margins in injury

determinations, coupled with Congress's explicit inclusion of the "magnitude of the margin of

dumping" as a factor to be considered, this is clearly insufficient.

 While the ITC reasonably determined that substitutability was limited between the

domestically-produced hardwood plywood and subject imports, in evaluating the impact of

---

 yet calculated a dumping margin, the Commission will use the dumping margins
published in Commerce's notice of initiation.  In final injury determinations, the
Commission will use the dumping margins most recently published by Commerce
before the record in the Commission investigation has closed.  These may be either
the margins published in Commerce's final determination, or if no final
determination has been made, in its preliminary determination.

SAA, H.R. Doc. No. 103-316, at 849, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4182–83.  Further,

 In addition to the factors listed in the 1979 Code that national authorities must
examine in determining the impact of dumped imports on the domestic industry,
Article 3.4 adds a requirement to consider the magnitude of the margin of
dumping.  As with the 1979 Code, however, the list of factors is not exhaustive,
and no one or several of the factors necessarily gives decisive guidance.

*Id.* at 811, 1994 U.S.C.C.A.N. at 4154.

subject imports on the domestic market, it failed to evaluate the magnitude of the dumping

margins.  *See* 19 U.S.C. § 1677(7)(E)(ii).

For the foregoing reasons, the Commission's determination is remanded to consider "the

magnitude of the margin of dumping," as it may or may not affect its analysis of the subject

imports' "impact" on the domestic industry.

## IV.    THE COMMISSION'S THREAT OF MATERIAL INJURY DETERMINATION IS NOT IN ACCORDANCE WITH LAW

When "determining whether an industry in the United States is threatened with material

injury by reason of imports (or sales for importation) of the subject merchandise, the

Commission shall consider, among other relevant economic factors": the nature of the subsidy;

the production capacity likely to result in significant increases in subject imports; the increase in

market penetration of subject imports; the likelihood that imports of subject merchandise will

have significant depressing or suppressing domestic price effects; increases in inventories of

subject merchandise; potential for product shifting in the foreign country; domestic development

efforts; and any other "demonstrable adverse trends."[45]  19 U.S.C. § 1677(7)(F)(i).

---

[45]        Specifically, 19 U.S.C. § 1677(7)(F)(i) provides:

In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, among other relevant economic factors—

(I) if a countervailable subsidy is involved, such information as may be presented to it by [Commerce] as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement [of the General Agreement on Tariff and Trade ('GATT') concerning export subsidies and targeted export subsidies]), and whether imports of the subject merchandise are likely to increase,

The list of statutory considerations is not exclusive, and the ITC's findings must be based

on the entire administrative record.  *See Dastech Int'l, Inc. v. U.S. Int'l Trade Comm'n*, 21 CIT

469, 472, 963 F. Supp. 1220, 1224 (1997).  "In making a determination of threat of material

injury, ITC must weigh industry views and views of other interested parties, together with all

other relevant economic factors as appropriate under the record of each particular investigation."

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 984 (Fed. Cir. 1994).

---

    (II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

    (III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

    (IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

    (V) inventories of the subject merchandise,

    (VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

    . . . .

    (VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

    (IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i).

Furthermore, the Commission "may use its sound discretion in determining the weight to afford

these and all other factors, but [it] cannot ignore them."[46]  *Id.*

As to the first statutory factor, the nature of the countervailable subsidy, Commerce

found the Chinese producers of hardwood plywood from China received a countervailable

subsidy for the provision of electricity for less than adequate remuneration.  Views at 38 n.142;

*see* 19 U.S.C. § 1677(7)(F)(i)(I) (The statute requires that "if a countervailable subsidy is

involved" the Commission must analyze "the nature of the subsidy . . . and whether imports of

the subject merchandise are likely to increase.").

Next, as to the second factor, the ITC did not find a likelihood of a substantial increase in

subject imports in the future based on excess production capacity in China.  Views at 39.  The

excess capacity data reflect that "[s]ubject Chinese capacity utilization was 83.1 percent in 2010,

86.9 percent in 2011 and 87.9 percent in 2012.  It was 70.5 percent in interim 2012 and 80.2

percent in interim 2013.  Subject Chinese capacity utilization is projected to be at 85.7 percent in

2013 and increase to 88.9 percent in 2014."  *Id.* at 39 n.149.  The Commission drew this

conclusion because: (1) "Chinese producers' capacity increased only 5.3[47] percent between

---

[46]      The Federal Circuit has also clearly stated that "the standard of assessing a 'threat of material injury' is different" than that for material injury because the threat of material injury statute "directs that [the] ITC 'shall' consider all relevant economic factors in a threat investigation."  *Suramerica*, 44 F.3d at 984.  In *Suramerica*, the Federal Circuit affirmed the CIT's decision to remand the case to the ITC because it failed to consider relevant information.  *Id.*  In other words, unlike in a material injury determination, where the Commission has discretion whether to consider other factors beyond the mandated statutory factors, in a threat of material injury determination, the Commission "must not disregard any relevant economic factor."  *Id.*

[47]      The data indicate that this number is in fact 4.8 percent.  *See* Final Staff Report at VII-5 tbl. VII-1.  This, however, does not alter the court's conclusions.

2010 and 2012";[48] and (2) "even if subject imports from China [were to] increase somewhat, we

do not find that any such increase would likely threaten material injury to the domestic industry

given the lack of causal nexus between the significant volume of subject imports and any injury

to the domestic industry over the [POI]." *Id.* at 39–40.

In further support that the Chinese producers' unused capacity would not threaten the

U.S. plywood industry, the Commission found Chinese plywood home market shipments were

increasing during the POI, and exports to countries other than the United States were expected to

remain steady.  Views at 40, 40 nn.155–56.  Again, as was the case in its injury determination,

the Commission found that any increase in volume of subject imports to the United States was at

the expense of nonsubject imports,[49] not the domestic product.  *Id.* at 38.

As to the third factor, "significant rate of increase of the volume or market penetration . .

. indicating the likelihood of substantially increased imports," the Commission found that "the

increase in subject import volume and market share during the [POI] does not indicate a

likelihood that any increase in subject import volume in the imminent future would result in

---

48      For example, in 2010 Chinese producers' capacity utilization was 83.1 percent, in
2011 it was 86.9 percent, in 2012 it was 87.9 percent, in the interim 2012 period it was 70.5, and
in the interim 2013 period it was 80.2.  Final Staff Report at VII-5 tbl. VII-1.  Moreover,
"[r]esponding subject foreign producers reported excess capacity of 243.4 million square feet in
2012, which represents 8 percent of total apparent U.S. consumption in that year."  Views at 39
(citation omitted).  In other words, even if all of the excess capacity were employed, the result
would be a fraction of the U.S. market.

49      "The market share of subject imports was 41.9 percent in [2010], 45.8 percent in
2011, and 47.9 percent in 2012; it was 44.2 percent in interim 2012 and 33.2 percent in interim
2013."  Views at 28–29; *see* Final Staff Report at IV-6 tbl. IV-3.  "Nonsubject sources included
Brazil, Chile, Canada, Indonesia, Malaysia, Romania, Russia, Uruguay, and Vietnam.
Nonsubject import market share was 40.8 percent in 2010, 36.4 percent in 2011, and 33.7 percent
in 2012; it was 36.7 percent in interim 2012 and 44.1 percent in interim 2013."  Views at 23
(citation omitted).  "The 7.1 percentage points in market share that nonsubject imports lost from
2010 to 2012 exceeded the 6.0 percentage points in market share that subject imports gained
during that period."  *Id.* at 29.

declines in the domestic industry's output or market share." *Id.*  This is consistent with the ITC's

volume and price effects findings in its injury determination, where it concluded that there was

no material injury despite significant import volume and significant underselling. *Id.*  Like its

injury determination, when considering the threat of material injury, the ITC found it unlikely

that any increase in volume and market share posed a threat of material injury because the

previously-observed increases in volume during the POI were not found to have injured the

domestic industry. *Id.* ("Increases in subject imports resulted in declines in the volume of

nonsubject imports, rather than of domestic product.").  Additionally, the ITC found "U.S.

demand is expected to continue to increase in the near future," based on information during the

POI showing "[t]he domestic industry has increased its production and market share." *Id.*

(citation omitted).

　　As has been discussed, the Commission concluded in its material injury determination

that there was a lack of significant adverse price effects despite significant underselling.  As part

of its threat determination, the Commission's consideration of the fourth factor, "imports of the

subject merchandise are entering at prices that are likely to have a significant depressing or

suppressing effect on domestic prices," was largely based on its previous findings. *See id.* ("As

discussed above, the domestic industry's performance generally improved during the [POI] . . . .

[T]he domestic industry was able to increase its market share in a growing U.S. market and to

increase prices overall for its hardwood plywood products.").  In addition, the Commission found

that "despite increasing inventories of low-priced subject imports," overall, "the condition of the

domestic industry improved during the [POI]." *Id.* at 41–42.

　　These findings are in line with the ITC's material injury price and volume analyses,

where it found there were significant import volumes of Chinese plywood during the POI, but

this significant import volume entering the United States did not materially injure the domestic

industry.  *Id.* at 29–30, 42.  Here, in its threat analysis, the ITC found that even if subject import

volume were to increase, any such increase would not threaten the domestic industry.  *Id.* at 40.

Because the Commission observed that during the POI, the significant volume of Chinese

imports did not injure the domestic industry, it concluded any future increase in volume would

likewise not pose a threat to the domestic industry.  *Id.* ("[E]ven if subject exports from China do

increase somewhat, we do not find that any such increase would likely threaten material injury to

the domestic industry given the lack of a causal nexus between the significant volume of subject

imports and any injury to the domestic industry over the [POI].").

        When evaluating "inventories of the subject merchandise," the Commission found such

inventories would not cause "significant price effects or an adverse impact on the domestic

industry in the imminent future" because "the domestic industry's market share and condition

improved over the [POI]."  *Id.* at 41, 41 n.157.  This improvement in the domestic industry's

market share occurred "despite increasing inventories of low-priced subject imports."  *Id.* at 41.

The Commission also found that "subject import inventories have recently fallen, and demand is

expected to increase."  *Id.*  Based on these findings, the Commission concluded these inventory

increases would not "cause significant price effects or an adverse impact on the domestic

industry in the imminent future."  *Id.*

        Examining the "potential for product-shifting," the ITC found "there is no indication in

the record that the subject imports, which are heavily concentrated in the lower end of the U.S.

market, will enter the higher-end of the market . . . in significant quantities in the imminent

future or at prices that are likely to depress or suppress domestic prices."  *Id.* at 41.  The

Commission "acknowledge[d] that petitioners offered statements that subject imports are moving

into higher grades," but found these statements unsupported by the record.  *Id.* at 26 n.88.  For

the ITC, the "data show[ed] that subject Chinese producers' and U.S. importers' shares of thicker

grade product remained relatively flat over the [POI]."  *Id.* at 42.  When considering the conflict

in information between the purchasers' comments and the data, the Commission concluded there

was no potential for product-shifting to the higher-end of the market.  *See id.* at 41–42.

Finally, the Commission considered the antidumping investigations and duty orders of

other countries imposed on subject imports, and whether they might lead to an increase in

volume of subject imports to the United States.  *See id.* at 40; *see also* 19 U.S.C.

§ 1677(7)(F)(i)(IX) ("[A]ny other demonstrable adverse trends that indicate the probability that

there is likely to be material injury by reason of imports.").  According to the Commission, the

European Union, Turkey, Israel, and South Korea have imposed antidumping duties on imports

of plywood from China.  Views at 40 n.156.  Colombia and Argentina have also initiated

investigations of hardwood plywood from China.  *Id.*  The ITC found, however, even if these

orders and investigations inhibited import volume and pricing in other countries, there was

nothing in the record demonstrating they would encourage an increase in subject imports to the

United States, thereby threatening the domestic industry.  *Id.* at 40.  In support of this conclusion,

the Commission reiterated the Chinese defendant-intervenors' contention that

> the antidumping duty orders on Chinese plywood in the [European Union],
> Turkey and Israel do not serve as a significant barrier to Chinese exports,
> because Turkey and Israel are insignificant markets and the order in the [European Union]
> covers only one specific type of plywood, which is an insignificant percentage of
> total Chinese production.

*Id.* at 40 n.156.

As stated, in its Final Determinations, the Commission concluded that an industry in the

United States is not threatened with material injury by reason of subject imports.  This

determination was based on the previously-mentioned findings that: (1) "excess capacity in

China does not indicate the likelihood of substantially increased imports of the subject

merchandise"; (2) "the increase in subject import volume and market share during the [POI]

d[id] not indicate a likelihood that any increase in subject import volume in the imminent future

would result in declines in the domestic industry's output or market share"; (3) "imports of

subject merchandise are not entering at prices that are likely to have significant depressing or

suppressing effect[s] on domestic prices"; (4) "the domestic industry's share and condition

improved over the [POI], despite increasing inventories of low-priced subject imports"; (5) there

was "no indication in the record that the subject imports . . . [would] enter the higher end of the

market"; and (6) "subject imports have had no significant actual or potential negative effects on

the existing development and production efforts of the domestic industry." *Id.* at 38–39, 41–42

(citation omitted).  In its Views, the Commission relied on its volume, price, and impact analysis,

detailed in its material injury discussion, to further support its threat of material injury

determination findings.  *Id.* at 37 n.141, 38.

  With respect to volume and market share, plaintiff takes issue with the data on which the

ITC relied, claiming it "marginalized the ability of Chinese . . . producers to significantly

increase exports of [hardwood plywood] to the U.S. market."  Pl.'s Br. 29; *see* Views at 39 n.147

("[T]he data obtained from the Chinese foreign producers accounted for approximately 52.4

percent of U.S. imports of hardwood plywood from China in 2012, and constitute the facts

available on the record.").  For plaintiff, the data reports only a portion of the industry in China,

accounting for a slight majority of U.S. imports in 2012, and include "the responses of only 89 of

a total of 350 companies to which the Commission's Foreign Producers' questionnaire w[as]

emailed or faxed."  Pl.'s Br. 29 n.13 (citing Views at 39 n.147).  In other words, because the

Commission did not use a comprehensive data set, plaintiff asserts the data do not accurately

represent the excess capacity of the Chinese producers.

Additionally, the Coalition argues that "the industry in China is export-oriented, focused

on the U.S. market, has substantial alternate markets that can be used to increase exports of

[hardwood plywood] to the U.S., and has a demonstrated ability to shift sales from one market to

another." Pl.'s Br. 29. Specifically, plaintiff asserts:

> Chinese producers' export shipments to the United States represented the fastest-
> growing segment of all shipments during 2010–2012 (increasing by 40.3 percent
> (252 million square feet) versus 13.9 percent (91 million square feet) for home
> market shipments and 16.1 percent (73 million square feet) for all other export
> shipments), and in 2012 surpassed the volume of home market shipments to become
> the highest-volume category of shipments at 875 million square feet.

Pl.'s Pre-Hearing Br. 59. Plaintiff maintains this information suggests that subject import

volume directed at the U.S. market will continue to increase significantly.

Plaintiff further argues the Commission's discussion of the antidumping orders in foreign

countries is legally flawed and lacking support. Pl.'s Br. 30. According to the Coalition, the

Commission improperly relied on Chinese defendant-intervenors' pre- and post-hearing briefs

for the proposition that "'Turkey and Israel are insignificant markets for plywood,' and the

antidumping order issued by the European Union 'covers only a specific type of plywood,

okoume plywood, which is an insignificant percentage of total Chinese production." Pl.'s Br.

30–31 (quoting Chinese Def.-Ints.' Pre-Hearing Br. 26). Plaintiff points out that no independent

record evidence was provided to support this assertion, and claims the Commission failed to

address the antidumping investigations in Argentina, Colombia, and South Korea. Pl.'s Br. 31.

Plaintiff next asserts the Commission "improperly discounted" its argument that the

Chinese product is entering the higher-end of the hardwood plywood market. Pl.'s Br. 31.

Specifically, according to plaintiff, the "overall quality and range of products provided by

Chinese producers has continually improved, and that the manufacturers in China are supplying

higher-value portions of the U.S. [hardwood plywood] market," thereby posing a future threat.

Pl.'s Br. 31.  That is, the Coalition argues the ITC ignored significant evidence demonstrating

"the movement of subject imports up the value chain over recent years," including affidavits and

hearing testimony suggesting "that subject imports will enter—indeed, have entered—the 'high

end of the market.'"  Pl.'s Br. 32, 35.

On this subject, the Coalition points to affidavits discussing "the movement of subject

imports up the value chain over recent years."  Pl.'s Br. 32.  These affidavits state that "the

Chinese producers begin competing at the low end and then graduate up the value chain towards

higher end products as they improve their manufacturing capabilities and gain market acceptance

in the United States."[50]  Pl.'s Post-Hearing Br. Ex. 1 ¶ 3.  Plaintiff's argument is that, although it

is a concern that lower quality Chinese products are entering the market and replacing the need

for higher-quality domestic products, Chinese producers are now also producing the same higher

quality product as domestic producers.  The Coalition states "[i]n light of these very detailed

sworn statements by persons with a long history in, and extensive knowledge of, the U.S.

[hardwood plywood] market," the Commission improperly "concluded that 'there is no

indication in the record that the subject imports . . . will enter the high[er] end of the market.'"

Pl.'s Br. 34 (quoting Views at 41).  For the Coalition, the entrance of the Chinese product into

---

[50]        "The Chinese product first took over our birch market using the nearby resource
of the birch forests in Russia, but has graduated even further up the supply chain to attack these
decorative hardwood plywood panels in species originating exclusively in North America and in
plywood grades (B and higher) and thicknesses (1/2" and thicker)."  Pl.'s Post-Hearing Br. Ex. 1
¶ 4.  "[[                                                                   ]] is made with face veneers of North American
species.  This is not the thin, utility application plywood I first encountered in the late 1990's.
This is maple, cherry and red oak made with hardwood veneers that originate in North America."
Pl.'s Post-Hearing Br. Ex. 1 ¶ 4.

the higher end and domestically-controlled sector, enhances the substitutability and competition

between the two products.  Pl.'s Br. 32–34.

      As to plaintiff's argument that the Commission underestimated the ability of Chinese

producers to increase exports, the court finds the Commission reasonably concluded, based on

industry data showing a lack of injury during the POI, that this was unlikely to change in the near

future.[51]  *See* Views at 38–39.  The ITC found that any potential increase in volume and market

share, as well as China's producers' excess capacity, would not pose a threat to the domestic

industry.  *See id.*  For the ITC, any excess capacity possessed by the Chinese producers during

the POI did not cause material injury to the domestic industry, and therefore the ITC concluded

such excess capacity would not threaten injury to the domestic industry going forward.  *See id.* at

40 ("[S]ignificantly increased imports of the subject merchandise into the United States are not

imminently likely," because "Chinese producers' increased shipments to [its] home market and

exports to other countries.").  Indeed, the record evidence shows the Chinese producers' capacity

only increased 5.3 percent during the POI, and that excess capacity was projected to decrease

during 2014.  *Id.* at 39; *see* Final Staff Report at VII-5 tbl. VII-1.  Thus, the Commission

reasonably concluded that significant import volume and excess capacity did not pose a threat of

material injury to the domestic industry.

      With respect to the Coalition's argument regarding antidumping investigations in other

countries, the court finds this argument unconvincing.  The Commission addressed the

antidumping proceedings in other countries when it noted South Korea reportedly imposed

---

[51]      This does not mean that the ITC's impact analysis in its material injury
determination is complete.  Instead, the information relied upon for its impact finding that
despite significant volume and underselling, the Commission found that the domestic industry's
financial indicators remained essentially the same throughout the POI.

preliminary duties, while Argentina and Colombia had initiated investigations. *See* Views at 40

n.156 ("In 2013, South Korea reportedly imposed preliminary antidumping duties on plywood

imports from China, and Argentina and Colombia initiated investigations on imports of Chinese

plywood."). The Commission considered these investigations and reasonably concluded they

would not have an impact on the domestic industry in the imminent future. *See id.* at 40 ("Even

if these orders have some disciplining effect on the volume and prices of subject Chinese exports

to certain markets in the imminent future, the record does not indicate that they will significantly

restrict China's exports generally and they will not deter the growth of home market

shipments."). Although the ITC cited the Chinese defendant-intervenors' pre- and post-hearing

briefs in its Views, it did so in an effort to "recognize that there are outstanding antidumping

duty orders or investigations on hardwood plywood from China in other countries."[52] *Id.*

Plaintiff, although disputing the Commission's reliance on this source, has not pointed to any

evidence contradicting the Commission's finding.

In addition, the record shows that the antidumping duties imposed by the European Union

were, in fact, only for imports of okoumé plywood from China. *See Final Staff Report* at VII-6

n.4 ("[T]he definitive anti-dumping duty on Chinese imports of okoumé plywood followed a

review of the original investigation that imposed the duties in 2004."). Further, the record

indicates that the hardwood plywood markets in Argentina, Colombia, Israel, and Turkey do not

---

[52]      The Chinese defendant-intervenors point to information in the record supporting
their assertions that the outstanding dumping orders will not have an impact on the domestic
industry. *See, e.g.*, Chinese Def.-Ints.' Br. 11 ("For the [European Union], the record shows that
the dumping order is only on one sub-category of plywood, okoume," and furthermore, "[t]he
Turkish dumping order was in place for over three years before the [POI] . . . . The dumping
order in Israel was removed in 2012 and therefore plainly cannot affect exports of plywood from
China going forward."), 12 ("Record information on the South Korean case indicates that the
Chinese companies have dumping margins as low as 3.75 percent.").

represent a large percentage of the total Chinese hardwood plywood market.  *See* Final Staff

Report at VII–6–VII–8 (data reflects that, during the POI, 34.2 percent to 41.5 percent of Chinese

plywood was consumed by the home market, while 23.5 percent to 27.9 percent was sold in

markets other than the United States).  Thus, the Commission reasonably determined that "the

record does not indicate that [these dumping orders] will significantly restrict China's exports

generally and they will not deter the growth of home market shipments."  Views at 40.

Next, the court finds meritless the Coalition's argument that the Commission ignored

evidence indicating subject imports were moving into the higher-end of the market, thereby

posing a threat of material injury to the domestic industry.  The ITC considered this argument,

but found it was "not borne out by the record, given importer and purchaser statements to the

contrary and data showing that subject Chinese producers' and U.S. importers' shares of thicker

grade product remained relatively flat over the [POI]."[53]  *Id.* at 42.  Therefore, the court finds

substantial evidence in the record supports the Commission's finding that it is unlikely subject

imports will enter the higher-end of the market in significant quantities in the imminent future.

The Coalition further asserts the Commission did not properly consider Commerce's

countervailing duty determination, which concluded electricity was provided to Chinese

---

[53]     The Coalition asserts the Commission "conflates (and, perhaps, confuses) the
terms 'higher-grade' and 'thicker grade,' reading these two distinct product characteristics as
synonymous."  Pl.'s Br. 34–35.  Plaintiff, in its own filings, however, suggests a correlation
between the thickness of hardwood plywood and its quality.  *See* Pl.'s Post-Hearing Br. Ex. ¶ 4
(suggesting that, in an attempt to move products into the higher-end of the market, subject
imports are being produced "in plywood grades (B and higher) and thicknesses (1/2" and higher)
to target high end cabinetry, furniture and fixtures"); Pl.'s Post-Hearing Br. Ex. 8 (Chinese-
produced hardwood plywood is entering the higher-end of the market by "gaining both total
market share across all grades and types of hardwood plywood based on thickness.  Because
hardwood plywood is a decorative interior product, species, grades and thickness are the three
primary determinants of the applications for these materials."); Hearing Tr. at 54 ("You buy
[hardwood plywood] because of the look and the thickness.").

producers for less than adequate remuneration.  *See* Pl.'s Br. 28.  The Coalition's argument is

that, where countervailable subsidies are present, the ITC is required to consider "whether

imports of the subject merchandise are likely to increase."[54]  19 U.S.C. § 1677(7)(F)(i)(I).  For

plaintiff, a subsidy margin of "13.58 or 27.16 percent for all but three Chinese

producers/exporters of hardwood plywood" is significant.  Pl.'s Br. 28.  Therefore, the Coalition

argues, the subsidy should have been analyzed in the Commission's determination because it has

a direct impact on the prospective underselling of subject merchandise.  Pl.'s Br. 28.  Put another

way, for plaintiff, this subsidy affects the health of the domestic industry, "the pricing practices

of subject imports, and by derivation, . . . the domestic industry's ability to compete on a fair

basis in the U.S. market."  Pl.'s Br. 28.  This argument is much the same as the Coalition's

earlier argument that there was "legal error inherent in [the ITC's] 'consideration' of the

magnitude of the dumping margins in its material injury analysis."  *See* Pl.'s Br. 28.

The ITC responds that its findings include the consideration of the countervailable

subsidy, thereby satisfying its obligations under the statute.  Def.'s Br. 37.  In its entirety, the

countervailing duty determination appears in a footnote appended to the Commission's

subsection B "Analysis" heading: "In its final affirmative countervailing duty determination on

hardwood plywood from China, Commerce found one subsidy program to be countervailable.

---

[54]        The statute provides, in pertinent part:

In determining whether an industry in the United States is threatened with material
injury by reason of imports (or sales for importation) of the subject merchandise,
the Commission shall consider, among other relevant economic factors—(I) if a
countervailable subsidy is involved, such information as may be presented to it by
[Commerce] as to the nature of the subsidy . . . , and whether imports of the subject
merchandise are likely to increase.

19 U.S.C. § 1677(7)(F)(i)(I).

The program determined to be countervailable is the provision of electricity to Chinese

producers for less than adequate remuneration." *See* Views 38 n.142 (citation omitted).

The Commission asserts that, since it discussed "whether imports of the subject

merchandise are likely to increase," it fulfilled its statutory obligation to consider countervailable

subsidies. Specifically, in its papers, the Commission points to its finding that the increase in

subject import volume and market share during the POI "did not indicate a likelihood that any

increase in subject import volume in the imminent future would result in declines in the domestic

industry's output or market share" satisfies its statutory obligation. *See* Def.'s Br. 37. In further

support of its view that it sufficiently took the subsidies into account, the ITC argues it also

found "there was no indication that subject imports would enter the higher-end of the market, in

which the domestic industry's sales are focused, in significant quantities in the imminent future

or at prices that are likely to depress or suppress domestic prices." *Id*.

It is clear that the ITC did not sufficiently consider the likely effects of the subsidies. In

reaching this conclusion the court has found that the development of the statute, and particularly

of 19 U.S.C. § 1677(7)(F)(i)(I) and (7)(E)(i), to be instructive. First, a subsidy exists when a

government or public entity of a country provides a financial, income, or other funding

mechanism that creates a financial contribution or benefit to a person. *Id.* § 1677(5)(B). As to

the consideration of such subsidies in a threat of material injury determination, subsection

(7)(E)(i) states:

> In determining whether there is a threat of material injury, the Commission shall
> consider information provided to it by [Commerce] regarding the nature of the
> countervailable subsidy granted by a foreign country (particularly whether the

countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement)[55] and *the effects likely to be caused by the countervailable subsidy*.

*Id.* § 1677(E)(i) (emphasis added).  Similarly, subsection (F)(i)[56] provides:

> [T]he Commission shall consider, among other relevant economic factors . . . if a countervailable subsidy is involved, such information as may be presented to it by [Commerce] as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and *whether imports of the subject merchandise are likely to increase*.

*Id.* § 1677(F)(i)(I) (emphasis added).

---

55      Article 3 and 6.1 of the Subsidies Agreement of the General Agreement on Tariff and Trade ("GATT") concern export subsidies and targeted export subsidies.  Article 3 of the Subsidies Agreement provides:

> [T]he following subsidies, within the meaning of Article 1, shall be prohibited:
> (a) subsidies contingent, in law or fact, whether solely or as one of several other conditions, upon export performance . . . ;
> (b) subsidies contingent, whether solely or as one of several other conditions, upon the use of domestic over imported goods.

Article 6.1 states:

> Serious prejudice in the sense of paragraph (c) of article 5 shall be deemed to exist in the case of:
> (a) total ad valorem subsidization of a product exceeding 5 per cent;
> (b) subsidies to cover operating losses sustained by an industry;
> (c) subsidies to cover operating losses sustained by an enterprise, other than one-time measures which are non-recurrent and cannot be repeated for that enterprise and which are given merely to provide time for the development of long-term solutions and to avoid acute social problems;
> (d) direct debt forgiveness of debt, i.e. forgiveness of government-held debt, and grants cover debt repayment.

 Agreement on Subsidies and Countervailing Measures arts. 3, 6.1 (World Trade Org.), *available at* https://www.wto.org/english/docs_e/legal_e/24-scm.pdf.

56      As noted, the statute states that countervailable subsidies must be considered in two ways.  Subsection E requires the Commission to consider "the effects likely to be caused by the countervailable subsidy."  19 U.S.C. § 1677(E)(i).  Subsection (F)(i)(I), however, requires the Commission to consider "whether imports of the subject merchandise are likely to increase."  *Id.* § 1677(7)(F)(i)(I).

As discussed, the Trade Agreements Act of 1979 implemented the international

agreements reached during the Multilateral Trade Negotiations by amending the Tariff Act of

1930.  As part of these 1979 amendments, Congress, for the first time, added the requirement

that the ITC consider the nature of any countervailing subsidies in its threat of material injury

analysis.[57]  In 1984, Congress again amended the statute, adding new subsection F, which

provides other factors to be considered in the ITC's threat of material injury analysis.  *See* H.R.

Rep. No. 98-725, at 38, *reprinted in* 1984 U.S.C.C.A.N. 5127, 5165 (1984) ("In determining

whether there is a threat of material injury in countervailing duty investigations, the ITC must

consider such information as may be presented by [Commerce] on the nature of the subsidy . . .

and the effects likely to be caused by the subsidy.  Legislative history states that export subsidies

are inherently more likely to threaten injury than other subsidies.[58]  There are no other factors

specified in present law for determining the threat of material injury.").

---

[57]      As part of Congress's discussion of the Commission's role in a threat of material
injury determination, Congress explained that the ITC "must satisfy itself that, in light of all the
information presented, there is a sufficient causal link between subsidization and the requisite
injury.  The determination of the ITC with respect to causation is . . . complex and difficult, and
it's a matter of judgment of the ITC."  S. Rep. No. 249, Trade Agreements Act of 1979, Pub. L.
96-39, 89, *reprinted in* 1979 U.S.C.C.A.N. 475 (1979).  Specifically, "[i]n making a material
injury determination with respect to threat of material injury in countervailing duty
investigations, the ITC may consider the nature of a subsidy practice and whether an adverse
impact on a domestic industry is more likely to be associated with such a subsidy practice as
opposed to what would be the case with another type of subsidy."  S. Rep. No. 249, Trade
Agreements Act of 1979, Pub. L. 96-39, 89, *reprinted in* 1979 U.S.C.C.A.N. 475 ("This is
particularly relevant with respect to export subsidies inconsistent with the Agreement on
Subsidies and Countervailing Measures, which are inherently more likely to threaten injury than
are other subsidies.").

[58]      The court notes that the legislative history reflects Congress intended for the
Commission to pay special attention to export and targeting subsidies.  *See* H.R. Rep. No. 98-
725, at 39, *reprinted in* 1984 U.S.C.C.A.N. at 5166; *see also* 19 U.S.C. § 1677(7)(F)(i)(I)
("[P]articularly as to whether the countervailable subsidy is a subsidy described in Article 3 or
6.1 of the Subsidies Agreement.").  Congress stated, however, that "the actual standards for

Specifically, the amendments included a requirement that the Commission consider the

"nature of the subsidy . . . and whether imports of the subject merchandise are likely to

increase."[59]  *Id.* § 1677(7)(F)(i)(I) (1984).  It also required the Commission to consider: the

exporter's production capacity; increased volume of subject imports; adverse price effects on the

domestic industry; inventories of subject merchandise; the potential for product-shifting in the

foreign country; whether the subject merchandise was a "raw agricultural product"; the "actual

and potential negative effects of existing development and production efforts of the domestic

industry"; and "any other demonstrable adverse trends."  *Id.* § 1677(7)(F)(i)(II)–(IX).

After the list of factors was added in subsection F of the statute, the requirement to

consider "the nature of the subsidy" in the Commission's threat determination was provided for

in two separate parts of the statute, subsection E and subsection F.  The provision sets out two

separate requirements: (1) to consider the countervailable subsidy and "the effects likely to be

caused by the countervailable subsidy," *id.* § 1677(7)(E)(i); and (2) to consider the subsidy and

determine "whether imports of the subject merchandise are likely to increase," *id.* §

1677(7)(F)(i)(I).

---

determining threat of material injury would be the same as in cases not involving export
targeting practices."  H.R. Rep. No. 98-725, at 39, *reprinted in* 1984 U.S.C.C.A.N. at 5166.

[59]        Prior to the amendment, there was "no statutory guidance as to the factors, other
than the nature of any subsidy."  H.R. Rep. No. 98-725, at 38, *reprinted in* 1984 U.S.C.C.A.N. at
5165.  The Ways and Means Committee went on to observe that "the absence of such criteria has
created uncertainty and confusion within the Commission and court challenges on what
standards should apply; partly for this reason there have been relatively few cases decided by the
Commission on the basis of threatened as opposed to actual material injury."  *Id.* at 39, *reprinted
in* 1984 U.S.C.C.A.N. at 5166.  Congress stated these new factors were previously contemplated
in the 1979 amendment of the law.  *Id.* ("The factors set forth in section 771(7) as amended by
the bill are consistent with, and restate legislative history on, this term in present law as it was
amended by the Trade Agreements Act of 1979.").

Not long after the 1984 amendments, the Court of International Trade began to recognize that the ITC's failure to consider a statutorily mandated factor in its threat determinations was not in accordance with law. *See, e.g.*, *Yuasa-Gen. Battery Corp. v. United States*, 11 CIT 382, 392, 661 F. Supp. 1214, 1222 (1987), *aff'd on reconsideration*, 12 CIT 624, 688 F. Supp. 1551 (1988) ("[T]he economic factors in section 1677(7)(F)(i) are set forth in the conjunctive, which requires consideration of all of them, at a minimum. To the extent the ITC failed to consider factor IV in the context of threat of injury or factors VII and VIII at all, that failure was not in accordance with law."); *Nat'l Pork Producers Council v. United States*, 11 CIT 398, 407, 661 F. Supp. 633, 641 (1987) (The Commission specifically considered the nature of the subsidy and "recognized the possibility that the imposition of countervailing duties on Canadian live swine might result in an increase in Canadian pork imports.").

As to the degree of consideration required, the Federal Circuit has held that the ITC failed to consider a countervailable subsidy within the meaning of subsection E in cases where the Commission has provided a greater analysis of the subsidies than is present here. In *Suramerica*, for example, the Federal Circuit found the ITC failed to consider, in its subsidy report, that a "bond program did not provide Venezuelan producers with a subsidy advantage over U.S. manufacturers," and accordingly, "did not comply with section 1677(7)(E)(i)'s requirement that the ITC consider the likely effects of any subsidy." *Suramerica*, 44 F.3d at 985. In that case, the International Trade Administration report explained that the subsidy program at issue "compensate[d] for overvaluation of the Bolivar," and the Venezuelan producers argued "that the prevailing free market exchange rate correlated with the subsidy." *Id.* In its Final Determinations, the Commission in *Suramerica* determined, however, that the bond program provided an "important incentive to imports." *Id.* (internal quotation marks and citation

omitted).  The Court found that the ITC failed to consider the actual effects of the subsidy, such

that the bond program "only facilitated the opportunity for Venezuelan producers to compete in

export markets on a level playing field."  *Id.*  The Federal Circuit found the ITC's failure to

consider the actual effects of the countervailable subsidy—that the subsidy in effect provided a

"level playing field" for Venezuelan producers and "did not provide Venezuelan producers with

a subsidy advantage over U.S. manufacturers"—was inadequate consideration under the statute.

*Id.*

The court finds the Commission failed to consider adequately the countervailable

subsidy, and thus its determination is not in accordance with law.  While the statute instructs the

Commission to consider the threat factors "as a whole," and provides that "[t]he presence or

absence of any [threat] factor . . . shall not necessarily give decisive guidance with respect to the

determination," if countervailable subsidies are present, then the Commission must actually

consider them and their effects on the domestic industry.  *See* 19 U.S.C. § 1677(7)(E)(ii); *see*

*also id.* § 1677(7)(F)(ii).  In its Final Determinations, just as with its evaluation of the

antidumping duty margins, the ITC noted Commerce's countervailing duty finding in a footnote

without any further explanation.  This alone does not amount to the consideration required by the

statute.

On this point, the court is not persuaded by the Commission's argument that its

discussion of the potential for volume increases amounts to consideration of "the nature of the

countervailable subsidy" and its effects.  *See* Def.'s Br. 36–37.  The Commission stated:

> [T]he increase in subject import volume and market share during the [POI] does
> not indicate a likelihood that any increase in subject import volume in the imminent
> future would result in declines in the domestic industry's output or market share.
> As described above, we have found that the increased volume of subject imports
> did not have significant adverse effects on the domestic industry during the [POI],
> during which the industry's market share and U.S. shipments also increased.

> Increases in subject imports resulted in declines in the volume of nonsubject imports, rather than of domestic product.  There is no evidence in the record that these trends will change in the imminent future.

Views at 38.  This discussion of increase in volume does not mention subsidies and indeed, its conclusion is based on factors unrelated to countervailable subsidies.  In addition to the factor at issue, two other statutory factors require that the Commission examine "whether imports of the subject merchandise are likely to increase."  *See* 19 U.S.C. § 1677(7)(F)(i)(I), (II) ("indicating the likelihood of substantially increased imports of the subject merchandise into the United States"), (III) ("a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports").  Thus, the court finds the Commission's discussion does not suffice to constitute consideration of the nature of the subsidy and its effects.

As noted, the Commission's consideration of "the nature of the subsidy" and "the effects likely to be caused by the countervailable subsidy," as well as "whether imports of the subject merchandise are likely to increase," was expressly contemplated by Congress in its 1979 and 1984 amendments.  Further, this Court and the Federal Circuit have recognized that the Commission must actually consider the nature of the subsidies by providing some explanation.  Accordingly, the court finds that the Commission's mention of the subsidy in a footnote appended to its "Analysis" heading in its Views does not constitute adequate consideration under the statute.  Views at 38.  Given the legislative history and case law illustrating the degree of consideration of countervailable subsidies that is required in a threat of material injury determination, the Commission's discussion of the subsidy in this case is not in accordance with law.

With the exception of the Commission's consideration of the countervailable subsidies, the remaining findings in its threat of material injury determination are supported by substantial evidence and are in accordance with law.


## CONCLUSION

Based on the foregoing, it is hereby

**ORDERED** that the United States International Trade Commission's final negative material injury determination is remanded in part; it is further

**ORDERED** that, on remand, the Commission shall issue a redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that on remand, the ITC is directed to explicitly evaluate the "magnitude of the dumping margins" when making its impact finding as part of its injury determination; and it is further

**ORDERED** that on remand, the ITC is directed to consider the nature of the countervailable subsidies in accordance with the statute; and it is further

**ORDERED** that the Commission shall reopen the record to solicit additional information required to make these determinations or otherwise complete its analysis; it is further

 **ORDERED** that the remand results shall be due on September 8, 2016; comments to the

remand results shall be due thirty (30) days following filing of the remand results; and replies to

such comments shall be due fifteen (15) days following filing of the comments.


Dated:          June 8, 2016
                New York, New York


                                                \s\  Richard K. Eaton
                                        _____
                                                Richard K. Eaton, Judge